HANNIBAL INDUSTRIES, INC., and
Western Tube & Conduit
Corp., Plaintiffs,

v.

UNITED STATES and United States
International Trade Commission,
Defendants.

Court No. 87–08–00848.

United States Court of
International Trade.

March 17, 1989.

Schagrin Associates, Roger B. Schagrin, Paul W. Jameson and Mark C. Del Bianco, Washington, D.C., for plaintiffs.

Lyn M. Schlitt, Gen. Counsel, James A. Toupin, Asst. Gen. Counsel, U.S. Intern. Trade Comn, Timothy M. Reif, Washington, D.C., for defendants.

DiCARLO, Judge:

Pursuant to Rule 56.1 of the Rules of this Court, plaintiffs challenge the final negative determination of the United States International Trade Commission (Commission) in *Certain Welded Carbon Steel Pipes and Tubes from Taiwan*, Inv. No. 731–TA–349 (Final), USITC Pub. 1994 (July 1987). The Commission determined that a United States industry is neither materially injured nor threatened with material injury by reason of less than fair value imports of Taiwanese produced light-walled rectangular pipes and tubing (L–WR).

This Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(A)(i) and (B)(ii) (Supp. IV 1986) and 28 U.S.C. § 1581(c) (1982). The Court finds that a material injury determination on the effect of dumped imports may not lawfully be based solely on the gross revenue loss to the domestic industry's product line when the record contains sufficient information to make that determination as to the domestic like prod-uct. The Court remands to the Commission to determine whether the impact of less than fair value imports on sales of the domestic like product constitutes material injury or threat of material injury and to explain the basis for its determination. The Commission's findings on the foreign producers' capacity and capacity utilization and the Taiwanese self-restraint program are supported by substantial evidence on the record and according to law.

## BACKGROUND

Commerce found less than fair value sales of L–WR by Yieh Hsing Enterprise Co., Ltd. (Yieh Hsing), the only Taiwanese producer that exported L–WR to the United States during investigation period from May 1 to October 31, 1986. *See Certain Light–Walled Rectangular Welded Carbon Steel Pipes and Tubes From Taiwan; Final Determination of Sales at Less Than Fair Value*, 52 Fed.Reg. 20,440 (June 1, 1987).

Shortly before making its final determination, the Commission discovered that other Taiwanese companies had exported L–WR after October 1986, and that these companies may have been largely responsible for an increase in L–WR exports to the United States during the first quarter of 1987. R. 69 at 3–5. The Commission reopened its investigation to identify the other producers and determine their capacity and capacity utilization. R. 79. After this further investigation, all five commissioners found no material injury and three of the commissioners also found no threat of material injury to a domestic industry by reason of dumped L–WR.

In her separate analysis of causation of material injury, the Chairman used a "five factor test" that focused on unfair price discrimination. USITC Pub. 1994 at 29–43. At the Commission's request, the Court remanded this portion of the determination in view of *USX Corp. v. United States*, 12 CIT ——, 682 F.Supp. 60 (1988), which found that this five-factor test improperly shifted focus of the investigation to an injury by predation standard. *See also Maverick Tube Corp. v. United States*, 12

CIT ——, 687 F.Supp. 1569 (1988). On remand, the Chairman adopted the Vice Chairman's views on causation and her finding of no material injury.

## DISCUSSION

An additional affirmative vote on either material injury or threat would have made this determination affirmative since an affirmative vote on either material injury or threat is treated as a vote that the overall determination should be affirmative. 19 U.S.C. § 1677(11) (1982); 19 C.F.R. § 207.9 (1988).

## I. MATERIAL INJURY

■ In the material injury portion of the determination, the analyses of three of the commissioners are uncontested. Plaintiffs challenge only the Chairman and Vice Chairman's joint causation of material injury analysis. The sole issue is whether the determination may be based on the impact of imports on total gross revenues of the domestic industry where the record permits analysis of the impact of imports on sales of the domestic like product.

The Chairman and Vice Chairman found that the domestic industry consists of producers of L–WR, who also produce other products. They calculated the additional revenue the domestic industry would have received if they had gained all of the sales that went to Taiwanese imports. That additional revenue was calculated to be 4.1 percent of the industry's 1986 L–WR shipments, and 1.3 percent of the industry's total sales, including products other than L–WR. The Chairman and Vice Chairman concluded that they did not believe "that a maximum gross revenue loss of less than 1.3 percent is material injury within the meaning of the controlling statutes." USITC Pub. 1994, at 85–86. They thus evaluated the injury to producers of L–WR by looking at those producers' entire production instead of that part that was affected by imports. Plaintiffs allege this is the first time that any Commissioner has made an injury determination dependent on the relationship between a company's total production and revenue losses attributable to imports of the product under investigation.

It is incumbent on the Commission to assess the effect of dumped imports in relation to United States production of a like product if available data permit separate identification of production

> in terms of such criteria as the production process or the producer's profits. If the domestic production of the like product has no separate identity in terms of such criteria, then the effect of the ... dumped imports shall be assessed by the examination of the production of the narrowest group or range of products, which includes a like product, for which the necessary information can be provided.

19 U.S.C. § 1677(4)(D) (1982). "Like product" refers to "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to ... investigation...." 19 U.S.C. § 1677(10) (1982); see Citrosuco Paulista, S.A. v. United States, 12 CIT ——, 704 F.Supp. 1075, 1081 (1988); Asociacion Colombiana de Exportadores de Flores v. United States, 12 CIT ——, 693 F.Supp. 1165, 1169 (1988). The narrowest group or range of products which includes a like product is referred to as the "product line." 19 U.S.C. § 1677(10) (1982). The product-line provision is an exception to the general rule that the Commission is to examine the impact of dumped imports with respect to relevant economic factors relating to a like product. 19 U.S.C. § 1677(4)(D) (1982); see Mitsubishi Elec. Corp. v. United States, 12 CIT ——, 700 F.Supp. 538, 563 (1988).

The Chairman and Vice Chairman decided the investigation warranted a product-line analysis of the domestic industry's financial condition because (1) separate identification of profits and the production process was allegedly impossible based on the available data, (2) the ease of converting production from L–WR to other types of pipe and tubing, and (3) a product-line analysis was consistent with prior L–WR investigations.

Plaintiffs do not dispute that in analyzing the financial condition of the domestic

industry, the Commission may examine profits, productivity, employment, cash flow, capacity utilization, and other relevant economic factors according to the entire establishment producing a like-product. 19 U.S.C. § 1677(4)(D) (1982). "Congress did not intend to require the Commission to obtain separate data on every enumerated economic factor; rather, it directed the Commission to obtain such data, where possible, as allows it to make 'a reasonably separate consideration.'" *Kenda Rubber Indus. Co. v. United States*, 10 CIT 120, 125, 630 F.Supp. 354, 357-58 (1986). The issue here, however, is not whether the Commission is required to obtain separate data, but rather whether the Commission is required to consider separate data it actually has.

While the Commission had economic information on producers' profits, investment return, cash flow, ability to raise capital, and investment on only a product-line basis, separate data were available on output, sales revenue, market share, capacity utilization, inventories, employment and wages that pertained only to L-WR. *See* Conf.R. 9. The Chairman and Vice Chairman had sufficient information to calculate the additional revenue the domestic industry would have received if they had gained all of the sales that went to Taiwanese imports, which was 4.1 percent of the value of the industry's 1986 L-WR shipments, and 1.3 percent of the industry's total sales, including products other than L-WR. USITC Pub.1994, at 85. Although they had sufficient information to calculate a figure of 4.1 percent of the value of L-WR shipments, the Chairman and Vice Chairman based their material injury determination on the 1.3 percent revenue loss to total production of L-WR and other products.

Under the Chairman and Vice Chairman's analysis, the grant or denial of import relief depends on the extent to which L-WR is made in the same domestic facilities as other products. This approach differentiates between (1) firms for whom L-WR is a large percentage of total production and revenue and firms for whom it is a small percentage, and (2) firms who are able to diversify production from L-WR

and firms who are less capable of doing so. The definition of "like product" should not be "interpreted in such a fashion as to prevent consideration of an industry adversely affected by the imports under investigation." S.Rep. No. 249, 96th Cong., 1st Sess. 90-91, *reprinted in* 1979 U.S. Code Cong. & Admin.News 381, 476-77.

Since the Chairman and Vice Chairman had sufficient information to reach a figure of 4.1 percent of the value of L-WR shipments, ignoring the available data on the L-WR in favor a lower 1.3 percent figure for total domestic sales of all products is contrary to law. The Court remands the causation of material injury portion of the Chairman and Vice Chairman's analysis to the Commission to determine whether the impact of less than fair value imports on sales of the domestic like product constitutes material injury or threat of material injury. The Commission may evaluate whether a revenue loss of 4.1 percent of the 1986 L-WR shipments constitutes material injury or threat of material injury, or employ any other appropriate analysis which the Court can then review.

## II. THREAT OF MATERIAL INJURY

Plaintiffs also challenge the Chairman and Vice Chairman's findings in the threat of material injury portion of the determination and the separate threat findings of Commissioner Lodwick. The Chairman, Vice Chairman, and Commissioner Lodwick found no threat of material injury to a domestic industry by reason of dumped L-WR. Plaintiffs contend that the findings on the Taiwanese producers' capacity and capacity utilization and on the Taiwanese self-restraint program for steel exports in their threat analyses are unsupported by the record and not in accordance with law.

### A. *The Taiwanese Producers' Capacity and Capacity Utilization*

19 U.S.C. § 1677(7)(F) does not define "threat" but instructs the Commission to consider relevant economic factors in determining whether an industry in the United

States is threatened with material injury by reason of imports of dumped merchandise, including:

> (II) any increase in production capacity or existing unused capacity in the exporting country likely to result in a significant increase in imports of the merchandise to the United States, [and]
>
> (VI) the presence of underutilized capacity for producing the merchandise in the exporting country[.]

19 U.S.C. § 1677(7)(F)(i) (Supp. IV 1986). *See Citrosuco Paulista, S.A. v. United States,* 12 CIT —–—, 704 F.Supp. at 1094 (1988).

The Chairman and Vice Chairman found that Yieh Hsing's capacity to produce L–WR increased substantially in 1984 but remained constant through 1986 into 1987 and that its capacity utilization dropped in 1985 and 1986 but was projected to rise in 1987. USITC Pub. 1994 at 22. They found, however, that the record is "highly equivocal about the extent to which other Taiwan producers have the capacity to export L–WR pipe to the United States." *Id.* The Chairman and Vice Chairman characterized the data collected on the capacity and capacity utilization of these other producers as "sketchy and highly questionable." *Id.* at 23. Nevertheless, they stated that

> [b]ased on information gathered through telephone conversations with U.S. government representatives in Taiwan, it appears that these six producers may have substantial L–WR production capability. However, the estimates of the size of that capability and the extent of actual Taiwan exports to the United States are so far out of line with other data gathered in this investigation that they appear to be unreliable.

*Id.* Given the perceived unreliability of the data from these telephone conversations, the Chairman and Vice Chairman concluded that the evidence demonstrated no threat of material injury.

In his separate concurrence, Commissioner Lodwick stated that information as to other Taiwanese producers was "either uncertain or seemingly contradictory" and provided "no solid basis for a real and imminent threat determination." USITC Pub. 1994 at 93. The Commissioner explained that "[w]here information is more clearly established and where annual data have been provided since 1984, there has been no increase in reported Taiwan industry capacity during 1984–1987." *Id.*

Plaintiffs claim the Commission's information on Taiwanese production capacity was inadequate because the Commission had no information on firms with the majority share of L–WR exports between January 1986 and March 1987. Plaintiffs also assert that the Commission had information on the capacity utilization of only Yieh Hsing. Plaintiffs argue this lack of information renders the majority's conclusion that the information shows no real and imminent threat of material injury to the domestic industry unsupported by the record.

In challenges to the Commission's investigative thoroughness, the court has remanded determinations only for failure to seek necessary information. *USX v. United States,* 11 CIT —–, 655 F.Supp. 487, 498–99 (1987); *Budd Co. Ry. Div. v. United States,* 1 CIT 67, 74–79, 507 F.Supp. 997, 1003–06 (1980).

The Commission recognized that it lacked data on the capacity and capacity utilization of the other Taiwanese producers and therefore reopened the investigation. R. 69 at 3–5; R. 79. There was some confusion about the actual number of Taiwanese companies with the capacity to produce and export L–WR. Plaintiffs' petition listed Yieh Hsing and three other firms as possible producers of L–WR. USITC Pub. 1994 at 22. These three other firms did not, however, export L–WR. *Id.* at 23. Yieh Hsing identified two firms capable of producing and exporting L–WR to the United States, but characterized these as "small producers of a limited range of products." R. 53 at 3–4.

The Commission sought information as to the production capacity and capacity utilization of the other firms from: (1) Commerce's Special Summary Steel Invoice (SSSI) listing export data, (2) the American

Institute in Taiwan (AIT), and (3) several Taiwanese producers through questionnaires and telephone interviews. From the SSSI, the Commission obtained information on the 1986 L–WR pipe production capacity of five Taiwanese producers who collectively accounted for a confidential percent of imports from Taiwan between January 1986 and March 1987. Conf.R. 20 at 1. The AIT provided capacity data on four companies. Conf.R. 20 at 2. The AIT also conducted an informal survey of several mini-mills in Taiwan which revealed that up to ten may produce L–WR. Conf.R. 20 at 2. The staff report indicates, however, that the AIT data "largely represent capacity to produce other pipes and tubes in addition to the L–WR." Conf.R. 20 at 2.

The Commission also had capacity utilization data on three of the five producers identified by the AIT. Conf.R. 20 at 2. The remaining two firms reported they had no capacity to produce L–WR. The Commission also unsuccessfully sought capacity utilization information from a sixth producer.

In addition to the statutory time constraints imposed upon an investigation, the Commission staff faced additional problems in obtaining information. First, only Yieh Hsing responded to the Commission's questionnaires. Second, the United States no longer maintains formal diplomatic relations with the Republic of China. Therefore, the Commission had to rely on the AIT and the producers themselves to provide information.

■ Given the short statutory deadlines in an injury investigation and the difficulties facing the Commission in obtaining information, *see Atlantic Sugar, Ltd. v. United States*, 2 Fed.Cir. (T) 130, 133–34, 744 F.2d 1556, 1560 (1984), the Commission made a reasonable effort to obtain the information needed to make the determination. Plaintiffs' contention that the Commission could have obtained more data is irrelevant. The question is not whether the Commission might have obtained additional information, but whether the determination is supported by substantial evidence on the record and according to law.

*Id.* at 134–35, 744 F.2d at 1561; 19 U.S.C. § 1516a(b)(1)(B) (1982).

Plaintiffs argue that evidence in the record detracts from the substantiality of evidence required to support the Commissioners' conclusion regarding the productive capacity and capacity utilization of firms that exported L–WR to the United States.

The record shows that much of the information provided by the four other firms conflicts with that provided by the AIT and the SSSI in terms of exports to the United States, capacity utilization, and capacity to produce only L–WR. Conf.R. 20 at 2. Except for Yieh Hsing and one other firm, a comparison of the AIT information and the SSSI data shows that no other Taiwanese firms which exported L–WR to the United States since January 1986 provided data on their capacity or capacity utilization. Conf. R. 20 at 2. Based on this record, the Chairman and Vice Chairman concluded that the estimates of large capacity levels of certain Taiwanese producers reported by the AIT were not sound and reliable. USITC Pub. 1994 at 23, 93.

A Commission determination is presumed correct and the party challenging the determination must show that it is unsupported by the record or not in accordance with law. 28 U.S.C. § 2639(a)(1) (1982); *see Copperweld Corp. v. United States*, 12 CIT ——, 682 F.Supp. 552, 575 (1988). Plaintiffs argue that the Commission's lack of information on capacity and capacity utilization was "particularly important in light of the fact that each of these companies had a very high potential for increasing its exports, since each had only begun exporting L–WR to the United States in the last five months of the investigation period." *Plaintiffs' Reply Brief* at 17. Other than this five-month increase in exports, there is no evidence in the record to support the plaintiffs' assertion of a very high potential.

Even if plaintiffs were correct that the Taiwanese firms had a high potential for increasing production, the "mere fact of increased capacity does not *ipso facto* imply increased exports to the United States."

*American Spring Wire Corp. v. United States,* 8 CIT 20, 28, 590 F.Supp. 1273, 1280 (1984), *aff'd sub nom. Armco Inc. v. United States,* 3 Fed.Cir. (T) 123, 760 F.2d 249 (1985). "A Commission finding that levels of imports will increase must be based on 'positive evidence tending to show an intention to increase the levels of importation.'" *Id.* (*quoting Matsushita Elec. Indus. Co. v. United States,* 6 CIT 25, 28, 569 F.Supp. 853, 857, *reh'g denied,* 6 CIT 187, 573 F.Supp. 122 (1983)).

Since it involves the projection of future events, the threat of material injury analysis is inherently "less amenable to quantification" than the material injury analysis. *Rhone Poulenc, S.A. v. United States,* 8 CIT 47, 59, 592 F.Supp. 1318, 1329 (1984). Congress directed the Commission to consider relevant economic factors, including capacity and capacity utilization, in its threat of material injury determination. 19 U.S.C. § 1677(7)(F)(i) (Supp. IV 1986). Moreover, Congress vested the Commission with broad discretion "to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence." *Maine Potato Council v. United States,* 9 CIT 293, 300, 613 F.Supp. 1237, 1244 (1985). The determination that there is a threat of material injury may not be based merely on "conjecture or supposition" but rather on "evidence that the threat of material injury is real and the actual injury is imminent." 19 U.S.C. § 1677(7)(F)(ii) (Supp. IV 1986).

The Chairman and Vice Chairman considered the capacity and capacity utilization of the Taiwanese firms but concluded the data were not probative. Rejecting these data, they then based their determination on other economic factors. The Chairman and Vice Chairman made a reasonable interpretation of the evidence and its significance, any complaint that the Commission drew an "adverse inference" against the plaintiffs is irrelevant. Since they considered capacity and capacity utilization data on the Taiwanese firms the Chairman and Vice Chairman acted according to law in refusing to conjecture as to their effect. *See* 19 U.S.C. § 1677(7)(F)(ii) (Supp. IV 1986). That the Commission had data on

allegedly less than a majority of firms that actually exported L–WR to the United States does not render the determination unsupported by substantial evidence. *See Atlantic Sugar,* 2 Fed.Cir. (T) at 138, 744 F.2d at 1563. Accordingly, the Chairman and Vice Chairman's findings as to the Taiwanese producers' capacity and capacity utilization are supported by substantial evidence on the record as a whole and are in accordance with law. For the same reasons Commissioner Lodwick's findings as to the capacity and capacity utilization of Taiwanese L–WR producers are according to law and supported by substantial evidence in the record.

B. *The Taiwanese Self–Restraint Program*

Although it refused to enter into a voluntary restraint agreement (VRA) with the United States, Taiwan implemented a self-restraint program in September 1986 to limit steel exports to the United States. R. 60. This program is an informal, unilateral system which, unlike a VRA, the United States has no right to enforce. USITC Pub. 1994 at A–7; R. 48 at 109–11; R. 60 at 1. The Taiwan Steel & Iron Industry Association administers the program under direction of its government. R. 60. The program has a set quota of 20,000 short tons per month for all steel products, subdivided into a "fixed" quota of up to 90 percent of the total and a "free" quota constituting the remaining 10 percent. *Id.;* Supp. R. 2 at 15.

The fixed quota is allocated quarterly among 109 Taiwanese steel producers and exporters and is calculated from their respective export levels to the United States between April 1985 and July 1986. R. 60. Nine firms including Yieh Hsing account for over half of the fixed quota allocations. *Id.* No firm may export more than 25 percent of its annual quota in any quarter, but it may transfer its allocation to another firm. *Id.*

The free quota is allocated on the basis of price bids among the firms and is divided into five product categories, one of which covers all plate and welded pipe

products (including L–WR). This category constitutes 35 percent of the free quota. *Id.* No single firm may account for more than 30 percent of the volume in any of these categories. *Id.* The free quota may be expanded to include any unused portion of the fixed quota from the previous quarter and "special volumes" approved by Taiwan's Board of Foreign Trade.

### 1. The Chairman and Vice Chairman's determination

 Rather than depending on capacity and capacity utilization data perceived to be "sketchy and highly questionable," the Chairman and Vice Chairman concluded that as a result of the Taiwanese self-restraint program, "any existing or unused L–WR pipe production capacity is unlikely to result in a significant increase in imports of the merchandise to the United States" even if the Taiwanese companies have substantial capability to produce L–WR. USITC Pub. 1994 at 23, 25. After examining the quotas under the self-restraint program and the nine companies with the largest fixed quotas, the Chairman and Vice Chairman did "not find it at all probable that the nine companies ... will fill their shares of the 'fixed' quota with significantly increased amounts of L–WR pipe." *Id.* at 24. They explained that under the informal restraint agreement,

> in order for Taiwan exports of L–WR to rise to injurious levels, we would have to make several very speculative assumptions. Only if we were willing to assume that *all* producers with the capacity to produce L–WR pipes and tubes would fill their entire fixed quotas with L–WR pipe, successfully bid for the full 35 percent of the "free quota," *and* choose to fill their entire "free quota" with L–WR pipe ... might the Taiwan exports rise to injurious levels. We are not willing to make such speculative assumptions. It would be speculation to say that merely because producers possess the capacity to produce L–WR, they will shift production into L–WR pipe and will fill their available quotas with only L–WR.

*Id.* at 24–25.

Plaintiffs assert the Chairman and Vice Chairman had no evidence which would support a conclusion that the self-restraint program would prevent substantial increases in Taiwanese L–WR imports that threatened material injury to the domestic industry because (1) the Commission did not know the fixed quota allocations of companies other than Yieh Hsing which exported L–WR to the United States, and (2) the Commission had no information as to what products these other firms manufactured. Plaintiffs argue that without such information it would be impossible to determine, given the unilateral and unenforceable nature of the program, whether the amounts of L–WR exported exceeded individual quota allotments. Plaintiffs also assert that the only evidence on the record shows that the self-restraint program would not prevent future increases in L–WR exports which would threaten the domestic industry with material injury, as shown by the increase in L–WR imports in the first quarter of 1987.

On the question of the increase in L–WR imports during the first quarter of 1987, the Chairman and Vice Chairman saw no reason to believe that it was anything other than a "one time occurrence." USITC Pub. 1994 at 25. They noted that Taiwanese L–WR exports remained at fairly stabile levels even when expected to rise when no investigations were pending. *Id.* at 25. The record shows that except for 1985, when imports of Taiwanese L–WR were very low, the overall quantity of L–WR from Taiwan was virtually the same in 1984 and 1986. *Id.* at A–32. This history indicated to the Chairman and Vice Chairman that imports would continue generally at the same level. In addition, Yieh Hsing's export-import division manager had testified that the increase in imports between January and March 1987 had resulted from exporters rushing to get export certificates approved to beat Commerce's preliminary determination. R. 48 at 89. This observation is supported by a list showing a higher number of export certificates issued in November and December 1986 than in the first quarter of 1987. Conf.R. 16 at A–10. From this evidence the Chairman and Vice Chairman

could reasonably conclude that the increase in exports over the first quarter in 1987 was unlikely to recur.

The Chairman and Vice Chairman also found that the self-restraint program would prevent future increases in L–WR exports that would threaten material injury. They stated that only under a worst-case scenario that assumed production and export of only L–WR under the fixed quota and the full 35 percent allowed under the free quota "might" there be an increase in L–WR exports under the program sufficient to threaten the domestic industry with material injury. USITC Pub. 1994 at 24–25. The Chairman and Vice Chairman were unwilling to assume that such a worst-case scenario would occur because the program covered all steel products instead of just L–WR, and it was unreasonable to assume that Taiwanese firms would produce only L–WR even if they had the capacity to do so. *Id.*

The record shows five categories under the self-restraint program within which fifteen different steel products are mentioned: billets, coils, wire rod, bars and rods, angles, shapes, sections, sheets plates, hoop, strip, stainless steel, seamless pipes, wires, nails, and structures. R. 55 at 3; R. 60. Under the fixed quota, a producer may export any mix of steel products so long as its total production does not exceed its allotment. R. 48 at 88. The Commission's determination that an industry is threatened with material injury "may not be made on the basis of mere conjecture or supposition." 19 U.S.C. § 1677(7)(F)(ii) (Supp. IV 1986); *Citrosuco Paulista, S.A. v. United States*, 12 CIT ——, 704 F.Supp. at 1098 (1988). Given the wide variety of products covered by the quota and the ability of firms to mix products exported under their respective allocations, it was reasonable for the Chairman and Vice Chairman to avoid speculation that firms would use their entire quota allocation to export only L–WR.

Nevertheless, plaintiffs assert that, in order to support their determination, it would be necessary for the Chairman and Vice Chairman to know the quota allotment of the firms that exported L–WR and whether those exports exceeded their quota allotments. The record lists nine Taiwanese companies with the largest shares of the fixed quota, of which Yieh Hsing has the fifth largest share. R. 60. Combined, these companies account for over half of the 18,000 short tons allowed under the fixed quota. *Id.* The record also contains a list, obtained from Commerce's SSSI file, of Taiwanese companies that had exported L–WR and the amounts in metric tons each exported from January 1986 through March 1987. Conf.R. 20. Although the Commission did not know the identity of every firm that might export L–WR or all the firm allocations under the fixed quota, the Commission did know the amounts of L–WR actually exported, and the maximum quota limits under the self-restraint program. R. 60; Conf.R. 20. Moreover, the Chairman and Vice Chairman found Taiwan is adhering to the quota and would likely extend the program past 1987. USITC Pub. 1994 at 23 n. 66. These findings are supported by information obtained from Commerce and USTR. R. 60 at 1–2.

It is not the Court's function to decide that it would have made another decision on the basis of the evidence. *Matsushita Elec. Indus. Co. v. United States*, 3 Fed. Cir. (T) 44, 54, 750 F.2d 927, 936 (1984). The Court's role is to determine whether the Commission's determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1982); *Atlantic Sugar, Ltd. v. United States*, 2 Fed.Cir. (T) 130, 132, 744 F.2d 1556, 1559 (1984). The Chairman and Vice Chairman's conclusion that the self-restraint program would prevent surges that threatened material injury to the domestic industry is supported by substantial evidence on the record as a whole and is in accordance with law.

### 2. Commissioner Lodwick's determination

■ Unlike the Chairman and Vice Chairman, Commissioner Lodwick placed "little weight on Taiwan's unilateral restraint policy." USITC Pub. 1994 at 94. He noted, however, that Taiwanese produc-

ers need export licenses and that the volume of material licensed from September 1986 to April 1987 was below recent shipment sizes to the United States. *Id.* This observation reflects evidence in the record. Conf.R. 16 at A–10; Conf.R. 20. Because export licenses indicate the likely level of imports in the near future, these data led the Commissioner to find "no indication of a real and imminent sustainable increase in the position of Taiwan imports in the U.S. market which would lead to material injury to the domestic industry." USITC Pub. 1994 at 94. The statute provides that the evidence underlying an affirmative threat must be "real" and the threatened injury "imminent." 19 U.S.C. § 1677(7)(F)(ii) (Supp. IV 1986); *see American Spring Wire Corp. v. United States,* 8 CIT 20, 28 n. 8, 590 F.Supp. 1273, 1281 n. 8 (1984), *aff'd sub nom. Armco Inc. v. United States,* 3 Fed.Cir. (T) 123, 760 F.2d 249 (1985). Accordingly, and for the reasons stated above, Commissioner Lodwick's determination is supported by the record as a whole and in accordance with law.

## CONCLUSION

The majority views on threat of material injury are supported by substantial evidence on the record as a whole and according to law. The Court remands the causation of material injury portion of the Chairman and Vice Chairman's analysis to the Commission to determine whether the impact of less than fair value imports on sales of the domestic like product constitutes material injury. The Commission may evaluate whether a revenue loss of 4.1 percent of the 1986 L–WR shipments constitutes material injury or threat of material injury, or employ any other appropriate analysis which the Court can then review.

The Commission shall file its decision on remand within 30 days. Plaintiffs may file a response within 20 days after receipt of the Commission's remand determination. Defendants may reply within 10 days of receipt of the plaintiff's response.