**CHINA NATIONAL ARTS AND CRAFTS IMPORT AND EXPORT CORPORATION, Tianjin Branch, now known as Tianjin Arts and Crafts Import and Export Corporation, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 90–04–00170.**

United States Court of
International Trade.

Aug. 15, 1991.

Grunfeld, Desiderio, Lebowitz & Silverman, David L. Simon and Bruce M. Mitchell (Philip Gallas and Jack Simmons, III, on brief), for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ.Div., U.S. Dept. of Justice, Velta A. Melnbrencis (Robert J. Heilferty, Atty.-Advisor, U.S. Dept. of Commerce, of counsel), for defendant.

## MEMORANDUM OPINION

MUSGRAVE, Judge.

### I. Introduction

This case involves one predominate issue: by what methods may market economy countries ("surrogates") be selected by the International Trade Adminstration ("ITA" or "Commerce") to determine foreign market value in an antidumping administrative review when the producing country has a state-controlled economy. In the second administrative review of cotton shop towels from the People's Republic of China ("PRC"), ITA chose Hong Kong as surrogate and determined that shop towels from the PRC were being dumped. *Shop Towels of Cotton from the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 55 Fed.Reg. 7756 (Mar. 5, 1990) ("Determination"). Plaintiff Tianjin Arts and Crafts Import and Export Corporation ("CNART") argues that the selection of Hong Kong was based on improper application of ITA practices and urges that ITA use Indonesia, Malaysia or the Philippines as surrogates. Defendant maintains that the determination should stand, although the parties agree that it should be remanded for recalculation to correct certain minor errors.

## II. Factual Background

In 1983, Commerce investigated imports of cotton shop towels from the PRC and found that they were being sold at less than fair value.[1] In the initial investigation, ITA determined that no shop towels were produced in Hong Kong, after a visit to Hong Kong by an ITA investigator. Public Document 87, at 13–14. Commerce based the foreign market value on the constructed value of the merchandise, with factors of production valued in a non-state controlled economy country (Indonesia) which was "determined to be reasonably comparable in economic development to the PRC."[2] The dumping margin was set at 38.8 per cent *ad valorem*.[3]

During the first administrative review, ITA determined the dumping margin using the best information available because the PRC exporters refused to provide information.[4] Commerce again considered using Hong Kong as a surrogate, but did not because it found that imports from Hong Kong were actually re-exports from other countries.[5]

Commerce began a second administrative review in November, 1987, covering the period October 1, 1986 through September 30, 1987.[6] Because ITA was required to base foreign market value on market economy prices, under 19 C.F.R. § 353.8 (1988),[7] Commerce requested comments on potential surrogates, and CNART proposed several countries. Commerce found that six countries were at a comparable stage of economic development to the PRC.[8] Two of these countries[9] were inappropriate because they had been determined to subsidize exports, including to some extent cotton shop towel exports. ITA dismissed each of the other proposed surrogates for various reasons, discussed *infra,* and found a dumping margin (for CNART) of 32.12 per cent, based on the unit values of cotton shop towels imported from Hong Kong. Determination, at 7759 and 7757.

## III. Standard of Review

In a review of a final determination of the ITA, this Court must decide whether the determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1991). "Substantial evidence on the record means more than a mere scintilla and such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1562, 2 Fed.Cir. (T) 130, 136 (1984) (footnote omitted). However, judicial review of the agency determination is a limited one. "An agency's 'interpretation of the statute need not be the *only* reasonable interpretation or the one the Court views as the most reasonable.'" *I.C.C. Indus., Inc. v. United States,* 812 F.2d 694, 700, 5 Fed.Cir. (T) 78, 85 (1987), *quoting Consumer Products Div., S.C.M. Corp. v. Silver Reed America, Inc.,* 753 F.2d 1033, 1039, 3 Fed.Cir. (T) 83, 90 (1985) (emphasis in original). Keeping these standards in mind, the Court finds that the ITA made several findings which are unsupported by substantial evidence.

---

1. *Final Determination of Sales at Less Than Fair Value; Shop Towels of Cotton from the People's Republic of China,* 48 Fed.Reg. 37,055 (August 16, 1983) ("Initial Determination").

2. *Id.,* 48 Fed.Reg., at 37,056.

3. *Shop Towels of Cotton from the People's Republic of China; Antidumping Order,* 48 Fed. Reg. 45,277 (Oct. 4, 1983).

4. *Shop Towels of Cotton from the People's Republic of China; Final Results of Antidumping Administrative Review,* 50 Fed.Reg. 26,020, 26,-021–22 (June 24, 1985).

5. *Id.,* 50 Fed.Reg. 26,024.

6. *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 52 Fed.Reg. 44,161 (Nov. 18, 1987).

7. A revised version of the regulation regarding calculation of foreign market value from state-controlled-economy countries is now found at 19 C.F.R. § 353.52 (1990).

8. India, Indonesia, Pakistan, the Philippines, Sri Lanka, and Thailand. Opposition, at 18.

9. Pakistan and Sri Lanka. *Id.*

## IV. ITA Incorrectly Chose Hong Kong as Surrogate as a Matter of Law

■ ITA chose Hong Kong as surrogate despite its own regulations preferring comparable economies and plentiful evidence that other countries would have provided a more comparable price comparison.[10] Generally, if no adequate information on production costs in the state controlled economy is available, ITA "shall determine" the foreign market value based on the price at which comparable merchandise produced in a market economy country at a similar level of economic development, is sold in the United States or other countries.[11] Commerce concedes that Hong Kong is not economically comparable to the PRC. Determination, at 7758. Therefore, the methodology Commerce used to reach the unlikely selection of Hong Kong must be reviewed.

The other proposed surrogates were deemed ineligible because their shop towel producers might have benefitted from export subsidies. *Id.* ITA selected Hong Kong because of the *possibility* that there may have been production there:

Conclusions reached by the Department concerning Shop Towel production in Hong Kong in an earlier period do not persuade us that the import data for this review period are incorrect. Even if there were no production in Hong Kong in an earlier period, this does not preclude production in a later period. Determination, at 7758.

CNART argues that the ITA had no concrete information on which to base a finding of cotton shop towel production in Hong Kong. Brief in Support, at 51. CNART objects strenuously to the selection of Hong Kong as the surrogate economy because shop towel prices are much higher there than in the proposed surrogates. CNART's Reply Brief ("Reply"), fn. 1, at 3. Defendant argues that a Census Bureau Report IM–146 for the period under investigation shows substantial imports from Hong Kong, and infers from it that shop towels were in fact produced there. Opposition, at 28. However, the IM–146 apparently does not state that production took place in Hong Kong, but merely lists the number and value of shop towels imported from Hong Kong.[12] In an earlier investigation, ITA found that shop towels imported from Hong Kong were produced elsewhere and were re-exported from Hong Kong.[13]

■ Although ITA could find no Hong Kong shop towel production in an on-site verification conducted prior to the Initial Determination, a corresponding report showed substantially *more* shop towel im-

---

10. 19 C.F.R. § 353.8(b) (1988). The regulations provide that foreign market value:

shall be determined, to the extent possible, from the prices or costs in a non-state-controlled-economy country or countries at a stage of economic development comparable to the state-controlled-economy country from which the merchandise is exported. Comparability of economic development shall be determined from generally recognized criteria, including per capita gross national product and infrastructure development (particularly in the industry producing such or similar merchandise).

(2) If no non-state-controlled economy country of comparable economic development can be identified, then the prices or constructed value as determined from another non-state-controlled-economy country or countries other than the United States shall be used, suitably adjusted for known differences in the costs of material and labor.

19 C.F.R. § 353.8(b)(1–2) (1988). Section 353.8 has since been amended.

11. 19 U.S.C. § 1677b(c)(2). It provides:

If the administering authority finds that the available information is inadequate for purposes of determining the foreign market value of merchandise under paragraph (1), the administering authority shall determine the foreign market value on the basis of the price at which merchandise that is—

(A) comparable to the merchandise under investigation, and

(B) produced in one or more market economy countries that are at a level of economic development comparable to that of the nonmarket economy country,

is sold in other countries, including the United States.

19 U.S.C. § 1677b(c)(2) (1991).

12. Reply, at 24. The IM–146 was not included with the administrative record.

13. *Shop Towels of Cotton from the PRC; Final Results of Antidumping Administrative Review,* 50 Fed.Reg., at 26,024.

ports from Hong Kong than shown in the IM–146 which Defendant now points to.[14] The verified finding of no production should be presumed correct. *Hannibal Indus., Inc. v. United States*, 710 F.Supp. 332, 337, 13 CIT ——, —— (1989); 28 U.S.C. § 2639(a)(1) (1991). Instead of checking the newer IM–146 data against its own findings, Commerce presumed that Hong Kong production had recommenced. Because the earlier FT–246 report shows greater imports of cotton shop towels, using Commerce's logic, there was more production in 1982 than during the period investigated here, despite the verification of no production.

The substantiality of the evidence presented to counter the original finding of no Hong Kong production is dubious. The IM–146 data is presumably correct as to the amount of shop towels imported from Hong Kong, but that does not establish that they were *produced* there. There is no concrete evidence on the record that shop towels were actually produced in Hong Kong during the investigation period. The assumption that there now is production is unsupported by substantial evidence. As a matter of law, administrative findings cannot be upheld if they are not based on substantial evidence. *Carlisle Tire & Rubber Co. v. United States*, 622 F.Supp. 1071, 1082, 9 CIT 520, 533 (1985). Therefore ITA's finding that cotton shop towels were produced in Hong Kong cannot stand and Hong Kong may not be used as surrogate for calculation of foreign market value.

## V. ITA Policy to Exclude Countries From Surrogate Status Where Subsidies May Possibly Exist is Erroneous

ITA rejected several of the proposed surrogates because of a policy to exclude countries whose exports might benefit from subsidies. Determination, at 7758. For example, CNART proposed Malaysia as a surrogate but ITA rejected it without

indicating why in the Determination. CNART maintains that ITA unlawfully rejected the proposed surrogates because subsidies were "potentially available," and not because any subsidies were actually used. Brief In Support, at 19. The government now argues that ITA used the "consistent practice . . . [of rejecting countries] subject to an anti-dumping order on comparable merchandise." Opposition, at 13. Of the proposed surrogates with purported comparable economic development, only Pakistan and Sri Lanka were rejected on these grounds.[15]

Commerce's rejection of several surrogates based on the possibility that the shop towel industries might benefit from subsidies is not based on substantial evidence in this case. ITA chose to assume subsidies where no concrete evidence or final determinations of subsidies existed. ITA states in the Determination that "[t]here is no evidence on the record that merchandise from other surrogate countries [other than Pakistan and Sri Lanka] is unfairly traded." Determination, at 7757.

### a. *Malaysia Was Wrongfully Rejected Based on a Prior Finding of a De Minimis Export Subsidy*

■ Government counsel argues that Commerce rejected Malaysia because of a favorable final determination on carbonsteel rod, although this was not explicitly spelled out in the Determination.[16] The only indication in the Determination as to why Malaysia was rejected is the statement that "[n]on-product-specific export subsidies *may also be available* to exporters of shop towels." Determination, at 7759 (emphasis added). Government counsel concedes that only a finding of export subsidies, not domestic subsidies, should exclude a country from surrogate status. CNART argues that the export subsidy found in the Malaysian carbon steel rod determination should be disregarded because it was *de*

---

**14.** U.S. Department of Commerce, *U.S. Imports for Consumption and General Imports*, FT–246, at 1–167 (1982) (T.S.U.S. 366.2740), Reply, at 24.

**15.** Determination, at 7756.

**16.** *Final Affirmative Countervailing Duty Determination; Carbon Steel Wire Rod from Malaysia*, 51 Fed.Reg. 29, 145 (Aug. 14, 1986).

*minimis.*[17] The government argues that because the Malaysian export subsidy program *could* have been used by cotton shop towel producers (although there is no evidence on the record that it was), it could have been used to an extent that would produce a subsidy. Although only one case in five investigations[18] of Malaysian imports found subsidies, and that case[19] found only *de minimis* export subsidies, government counsel wants to provide Commerce the discretion to *assume* that the Malaysian shop towel industry might possibly use that *de minimis* export subsidy to a countervailable extent.

Plaintiff counters that such reasoning was entirely speculative, and complains that this constitutes a "mere possibility" standard, not based on any factual findings. The Court agrees. *Asociacion Colombiana de Exportadores de Flores v. United States*, 704 F.Supp. 1114, 1117, 13 CIT ——, —— (1989), *aff'd*, 901 F.2d 1089 (Fed.Cir.1990) ("Speculation is not support for a finding...."). This type of conjecture is exactly the type of reasoning the substantial evidence standard aims to prevent, and is totally unsupported by substantial evidence. ITA may not rely on *de minimis* export subsidies to disqualify Malaysia from use as a surrogate to calculate foreign market value.

b. *Commerce May Not Exclude Countries From Surrogacy Based on Preliminary Findings of Export Subsidies*

■ CNART claims they have no way of protecting their interests from the indiscriminate use of preliminary findings by ITA. Interested parties may only appeal *negative* preliminary determinations under 19 U.S.C. § 1516a (1991). Only *final* determinations may be reviewed. 19 U.S.C. § 1516a(a)(2)(B). Preliminary results are presumably less reliable than final results of investigations or administrative reviews. Preliminary results are reviewed and commented upon by interested parties before becoming final.[20] Hearings are held, if requested.[21] ITA uses the time between preliminary and final determinations to correct and adjust its preliminary findings and reach more accurate conclusions in the final determination. *Tehnoimportexport v. United States*, 15 CIT ——, ——, 766 F.Supp. 1169, 1174 (1991). ITA's use of preliminary determinations which did not become final because of the withdrawal of the petition is analogous to citing cases which become moot while *sub judice.* In this case, the preliminary determinations were, in effect, mooted by Indonesia and the Philippines' accession to the GATT Subsidies Code. Under the new circumstances, the threshold for obtaining an affirmative determination had risen above the level plaintiff was willing to attempt to overcome. In effect, the law changed, thus mooting the preliminary determination. The Court cannot perceive why mooted preliminary determinations should have any force or effect, however remote. They should be treated like court cases which become moot while awaiting judicial decision: they should be vacated.

Commerce states that its consistent practice has been to reject any surrogate candidate subject to an antidumping order on comparable merchandise, or determined to provide export subsidies. Opposition, at 13. Both are logical standards often used to exclude surrogates. A surrogate which

---

17. *I.e.* less than .50 per cent margin.

18. The cases with negative determinations are: *Final Negative Countervailing Duty Determination; Certain Textile Mill Products and Apparel from Malaysia*, 50 Fed.Reg. 9852 (Mar. 12, 1985); *Final Negative Countervailing Duty Determination; Certain Steel Wire Nails from Malaysia*, 54 Fed.Reg. 36,841 (Sept. 5, 1989); *Final Negative Countervailing Duty Determination; Thermostatically Controlled Appliance Plugs and Probe Thermometers Therefor from Malaysia*, 53 Fed.Reg. 50,059 (Dec. 13, 1988); *and, Final Negative Countervailing Duty Determination; Welded Carbon Steel Pipe and Tube Products from Malaysia*, 53 Fed.Reg. 46,904 (Nov. 21, 1988).

19. *Final Affirmative Countervailing Duty Determination; Carbon Steel Wire Rod from Malaysia*, 53 Fed.Reg. 13,303 (Apr. 22, 1988).

20. *See* Sturm, Customs Law & Administration, § 48.1, at 20–22 (1990).

21. *Id.*

is subsidizing exports or which is under investigation on analogous merchandise should be avoided because its export data may be tainted. Yet Commerce expanded that practice when applying it to this case:

It is the Department's general practice when using prices of U.S. imports to disregard imports from certain countries in determining foreign market value because of the *possibility* that such imports are benefitting from export subsidies.

Determination, 55 Fed.Reg., at 7758 (emphasis added).

Commerce's discretionary practice of excluding surrogates determined to provide subsidies has expanded two-fold from its inception. First, Commerce decided to exclude surrogates determined to provide subsidies to any industry, assuming that those subsidies benefitted other unrelated industries. Second, Commerce made a logical leap from that tenuous platform to exclude surrogates which may possibly provide export subsidies, without any proven, hard facts to corroborate the "finding" of subsidies. No final determination of subsidies was made for any textile industry in Indonesia, Malaysia or the Philippines, nor are there any final determinations outstanding that subsidies exist in any industry in those countries.

Commerce states that it rejects surrogates because of the possibility that their products benefit from export subsidies. But Commerce's actions follow a different line. The original Commerce Department practice rejected import data which might have benefitted from established subsidies, while the new practice disqualifies data on production which *might* benefit from subsidies which *might* exist. Imports which might benefit could just as easily *not* benefit, from a subsidy which just as easily might not exist. No substantial evidence is necessary to the second standard. No adversarial procedure is available to exporters to defend the disqualified surrogates. By expanding its discretion, Commerce

forces itself to *guess* whether subsidies exist. The Court is aware that the ITA sometimes takes an "overly sweeping view of the authority it is granted." *Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565, 1571, —— Fed.Cir. (T) ——, —— (1990). The substantial evidence standard was developed to avoid such arbitrary uses of discretion. Guesswork is no substitute for substantial evidence in justifying decisions.

The new practice cannot stand without an explanation of why the ITA believes it necessary to expand the exclusion standard in order to sanitize the information used to calculate foreign market value. The use of preliminary findings to disqualify surrogates is arbitrary and not in accordance with law. The result in this case is a Determination that excludes several economically comparable third world surrogates in favor of an industrialized country.[22] Commerce has extended its discretion without any precedent or any basis in law or ITA regulations and the result is that the new "practice" cannot stand as a matter of law in the instant case.

### c. *Indonesia and The Philippines*

CNART objects to ITA's use of factual findings from preliminary investigations to disqualify Indonesia and the Philippines. Both are conceded to be more economically comparable to the PRC than is Hong Kong. Commerce disqualified them based on preliminary determinations which were later dropped with no final findings made. Because the findings were never finalized, CNART challenges the validity of those findings and the conclusions drawn from them. Brief in Support, at 36–38. Presumably ITA could exclude the countries subject to a preliminary finding of dumping in perpetuity because those findings can never be challenged administratively. Reply, at 7.

#### 1. Indonesia

■ Commerce rejected Indonesia because Commerce had preliminarily found

---

**22.** *See Tehnoimportexport v. United States,* 15 CIT ——, ——, 766 F.Supp. 1169, 1174 (1991) ("Commerce is required to compare similarly developed economies; for example, the United Kingdom would not make a suitable surrogate for Albania.").

that countervailable domestic and export subsidies were provided to textile producers, with a dumping margin of 0.83 per cent.[23] After the preliminary finding, Indonesia acceded to the GATT Subsidies Code, *i.e.* became a "Country under the Agreement," [24] and plaintiff in the investigation dropped its suit. By becoming a Country under the Agreement Indonesia tacitly agreed to halt the subsidy that had been found.[25] CNART points out that if ITA explicitly found that Indonesia subsidizes exports despite accession to the GATT Subsidies Code, it would be exceeding its statutory authority, as only the United States Trade Representative is authorized to do so. Reply, at 8. Such a finding is implicit when ITA disqualified Indonesia because of suspected subsidization. CNART submits that Indonesia's accession to the GATT creates an inference that export subsidies are *not* available to the shop towel industry. Reply, at 9.

The only basis for excluding Indonesia from surrogacy was a preliminary textiles determination of 1984. For the reasons stated above, ITA wrongfully excluded surrogates based on preliminary subsidy findings and Indonesia may be considered for use as surrogate.

### 2. Philippines

■ The ITA rejected the Philippines as a surrogate because its textile industry had a preliminary finding of subsidization.[26] ITA also disqualified it because of a withdrawn determination of export subsidies on canned tuna.[27] ITA made the "reasonable inference" that shop towel producers had subsidies as well. Opposition, at 20. CNART argues that the *Canned Tuna* subsidy should not disqualify the Philippines, because the subsidy was *de minimis*, and because the ITA revoked the determination following two reviews resulting in *de minimis* margins. Brief in Support, at 33–34, Reply, at 10. The Court agrees. Revoked determinations cannot be used to disqualify surrogates. The Philippines, like Indonesia, has acceded to the GATT Subsidies Code, and the ITA therefore should not give preclusive effect to a preliminary countervailing duty determination. Both the Philippines and Indonesia should logically have been presumed *not* to subsidize.

Indonesia and the Philippines cannot be disqualified solely on the basis of preliminary investigation findings because of the many procedural and substantive differences between preliminary and final results of administrative reviews. Collateral effects should not be given to untested findings made in preliminary determinations. Countries that are more economically comparable to the PRC than the chosen surrogate which were excluded on the basis of preliminary determinations must be considered for use in place of Hong Kong.

### VI. ITA's Claim That There is a General Practice is Unfounded

■ Commerce cites two prior determinations to establish the "general practice" of ignoring surrogates that may possibly provide subsidies.[28] The language of the *Steel Wire Nails* determination is similar to the Determination at issue here. However, ITA does not explain why it enlarged the scope of the standard used to exclude surrogates; the *Steel Wire Nails* determination merely states that: "[w]e are excluding Israel from our determination of foreign market value because of the possibility that such imports are benefitting

---

23. 49 Fed.Reg. 49,672 (Dec. 21, 1984).

24. *See* 19 U.S.C. § 1671(b) (1991).

25. Article 9 of the Agreement in Interpretation and Application of Articles VI, XVI of the General Agreement on Tariffs and Trade, T.I.A.S. 9161.

26. 50 Fed.Reg. 15,208. This investigation was not concluded because the petition was withdrawn.

27. *Final Affirmative Countervailing Duty Determination; Canned Tuna from the Philippines,* 48 Fed.Reg. 50,133 (Oct. 31, 1983).

28. *Steel Wire Nails from the People's Republic of China; Final Determination of Sales at Less Than Fair Value,* 51 Fed.Reg. 10,247, 10,248 (March 25, 1986), and *Porcelain–on–Steel Cooking Ware from the People's Republic of China,* 51 Fed.Reg. 36,419 (Oct. 10, 1986).

from export subsidies, and are instead using only Korea." [29]

The other case cited in the Determination as evidence of a "general practice" does not use the "possibility" standard. *Porcelain–on–Steel Cooking Ware* first cites the established practice of excluding due to known subsidies,[30] and later states that "[i]n considering which countries' imports to use in calculating foreign market value, we generally disregard imports from countries that are also under investigation, non-market economy exporters and *countries believed to maintain export subsidies.*" [31] The *Porcelain–on–Steel Cooking Ware* determination originally uses the "known subsidies" standard, so the quoted language may be regarded as a reiteration of that standard. ITA cannot buttress the "mere possibility" standard by citing to the more pedestrian "known subsidies" standard case.

Commerce implies in the Determination that the "possibility of subsidies" standard is the equivalent of "countries believed to maintain export subsidies" used in the *Porcelain-on-Steel Cooking Ware* determination. There is a logical difference between a belief, which usually must have some basis in fact, and a possibility, which does not necessarily need any facts to back it up. Possibilities are not equivalent to beliefs, and it is not enough that a thing be possible for it to be believed. Therefore, two unjustified and unrelated prior statements do not a general practice make. ITA's statement that there is a "general practice" is unsupported.

## VII. Disqualification of Surrogates for Subsidies Found in Other Industries

ITA disqualified other countries because of subsidies applicable to areas other than shop towels, or even textiles. CNART argues that there is no reason to believe that a set of programs available to and utilized by one industry is *ipso facto* available to and being used by a totally different industry. Brief in Support, at 34. In light of this Court's holding above, it is unnecessary to reach the merits of this argument. Comparable economies are qualified for surrogacy, and must be used in a redetermination of the dumping margin. Should the ITA disqualify Malaysia, the Philippines and Indonesia on other grounds, the Court may reach the merits of CNART's argument, but does not need to do so at this time.

## VIII. Conclusion

ITA's selection of Hong Kong as surrogate was unsupported by substantial evidence. ITA's exclusion of Indonesia, the Philippines and Malaysia was also unsupported by substantial evidence on the record as a whole. The evidence suggests that either Indonesia or the Philippines are more economically comparable to the PRC than Malaysia. All three are more comparable than Hong Kong. As a result, this case is remanded to the International Trade Administration for recalculation of the dumping margin using import unit values from Indonesia, the Philippines or Malaysia. In addition, the recalculation must correct the clerical errors described at pages 53 and 54 of CNART's Brief in Support.

---

**29.** *Steel Wire Nails,* 51 Fed.Reg., at 10,248.

**30.** *Porcelain–on–Steel Cooking Ware,* 51 Fed. Reg., at 36,421.

**31.** *Id.* 51 Fed.Reg., at 36,423 (emphasis added).