Slip Op. 02-134

# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Judge Judith M. Barzilay**

| | | |
|---|---|---|
| MARINE HARVEST (CHILE) S.A., | **:** | |
| | **:** | |
| Plaintiff, | **:** | **Court No. 01-00808** |
| | **:** | |
| v. | **:** | |
| UNITED STATES, | **:** | |
| | **:** | |
| Defendant. | **:** | |
| | **:** | |

[Plaintiff's Motion for Judgment Upon the Agency Record Granted in Part; Department of Commerce Ordered to Refund Cash Deposits; Case Remanded on Issue of Successorship.]

Decided: October 31, 2002

*Arnold & Porter, (Michael T. Shor),* for Plaintiff.

*Robert D. McCallum*, *Jr.*, Assistant Attorney General, *David M. Cohen*, Director; *(Lucius B. Lau)*, Assistant Director; Commercial Litigation Branch, Civil Division, Department of Justice; *Glenn R, Butterton*, Attorney, Office of Chief Counsel for Import Administration, United States Department of Commerce, Of Counsel.

## OPINION

**BARZILAY, JUDGE:**

### I. INTRODUCTION

This case challenges an agency action taken within the purview of the United States antidumping laws and presents the court with a clear example of a case in which the facts compel the result. Two entities, now merged into one company, exported fresh Atlantic salmon from

Chile to the United States. Despite the fact that only one of the companies was ever found to be selling its goods at less than fair value[1] and even so at almost *de minimis* margins[2] and, further, for only one of the three examined periods, the merged company now has been forced to deposit millions of dollars with the United States government and compelled to undergo administrative reviews on its past and future entries. It seeks relief from this Court.

Plaintiff Marine Harvest (Chile) S.A. ("Marine Harvest") has filed a USCIT R. 56.2 Motion for Judgment Upon the Agency Record, challenging certain aspects of the Department of Commerce's ("Commerce" or "government") preliminary and final determinations of the changed circumstances review that it conducted concerning Marine Harvest. *See Notice of Final Results of Changed Circumstances Antidumping Duty Review: Fresh Atlantic Salmon From Chile*, 66 Fed Reg. 42,506 (Aug. 13, 2001) ("*Changed Circumstances Final*"); *Notice of Initiation and Preliminary Results of Changed Circumstances Antidumping Duty Review: Fresh Atlantic Salmon From Chile*, 65 Fed. Reg. 52,065 (Aug. 28, 2000) ("*Changed Circumstances Preliminary*"). The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c).

---

[1] The purpose of an antidumping investigation is to determine whether imported merchandise is being dumped or sold at less than its fair value ("LTFV") in the United States. Section 1673 of Title 19 of the United States Code (1999) describes a two-step process where Commerce first conducts an LTFV investigation and, if Commerce makes an affirmative determination of dumping, the International Trade Commission ("ITC") next investigates whether a domestic industry has been materially injured or threatened with material injury. *See also Badger-Powhatan v. United States*, 9 CIT 213, 216, 608 F. Supp. 653, 656 (1985) (holding that both affirmative LTFV and material injury determinations are required before an antidumping order may issue).

[2] "[A] weighted average dumping margin is de minimis if [Commerce] determines that it is less than 2 percent ad valorem or the equivalent specific rate for the subject merchandise." 19 U.S.C. § 1673b(b)(3) (1999). "Subject merchandise" is merchandise subject to an antidumping investigation, review or order. § 1677(25).

## II. Background

On June 12, 1997, the Coalition for Fair Atlantic Salmon Trade ("FAST" or "domestic industry") petitioned Commerce to initiate a less-than-fair-value ("LTFV") investigation, alleging that imports of fresh Atlantic salmon from Chile[3] were being, or were likely to be, sold in the United States at less than their fair value, and that such imports were materially injuring, or threatening material injury to, a U.S. industry. On July 10, 1997, Commerce began the LTFV investigation of fresh Atlantic salmon from Chile. *See Initiation of Antidumping Duty Investigation: Fresh Atlantic Salmon from Chile*, 62 Fed. Reg. 37,027 (July 10, 1997). After determining that it could not examine all Chilean producers and exporters, Commerce specifically investigated five leading Chilean producers including Marine Harvest and Pesquera Mares Australes Ltda. ("Mares Australes"). *See id.* On June 9, 1998, Commerce announced its final determination that "fresh Atlantic salmon from Chile [was] being sold, or [was] likely to be sold, in the United States at less than fair value." *See Notice of Final Determination of Sales at Less Than Fair Value: Fresh Atlantic Salmon from Chile*, 63 Fed. Reg. 31,411, 31,412 (June 9, 1998). The weighted-average dumping margin percentages of Marine Harvest and Mares Australes were found to be 1.36 (*de minimis*) and 2.24, respectively.[4] *See id.* at 31,437. The

---

[3] Fresh Atlantic salmon that fell within the scope of the investigation refers to farmed Atlantic salmon, whether imported "dressed" or cut. The merchandise subject to the investigation is classifiable as item numbers 0302.12.0003 and 0304.10.4091 of the Harmonized Tariff Schedule of the United States. *See Initiation of Antidumping Duty Investigation: Fresh Atlantic Salmon from Chile*, 62 Fed. Reg. 37,027 (July 10, 1997).

dumping margin for Mares Australes was later corrected to 2.23 percent.[5] *See Notice of*

*Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order:*

*Fresh Atlantic Salmon from Chile*, 63 Fed. Reg. 40,699, 40,700 (July 30, 1998) (*"Amended*

*Final"*). Accordingly, Commerce excluded Marine Harvest from its final determination because

its *de minimis* rate in the investigative stage meant that it was not dumping and, therefore, did not

suspend liquidation on Marine Harvest's entries into the United States. *See* 19 U.S.C. §

1673d(a)(4) (1999). On July 28, 1998, the International Trade Commission ("ITC") issued an

affirmative determination that "an industry in the United States [was] materially injured or

threatened with material injury by reason of imports" of fresh Atlantic salmon from Chile.[6]

*Fresh Atlantic Salmon from Chile*, 63 Fed. Reg. 40,315 (July 28, 1998). On July 30, 1998,

Commerce issued an antidumping duty order, announcing its intention to direct the United States

Customs Service ("Customs") to "assess . . . antidumping duties on all unliquidated entries of

fresh Atlantic salmon from Chile" at par with the estimated dumping margin percentages,

starting on the date of the ITC injury determination. *Amended Final* at 40,700. Marine Harvest

was excluded from the antidumping duty order. *See* 19 C.F.R. § 351.204(e)(1) (2002).

Consequently, Customs was instructed not to collect antidumping duty cash deposits on Marine

---

[5] The all-others rate was also revised to 4.57. *See Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Fresh Atlantic Salmon from Chile,* 63 Fed. Reg. 40,699 (July 30, 1998) (*"Amended Final"*). The all-others rate equals the weighted average of the estimated dumping margins of all exporters and producers investigated, "excluding any zero and *de minimis* margins." § 1673d(c)(5)(A). Thus, in the calculation of the all-others rate, the dumping margin of Marine Harvest was excluded and that of Mares Australes was included.

[6] This determination by the ITC was later interpreted by Commerce to be a "threat determination," as opposed to a "material injury" determination. *See Amended Final* at 40,700.

Harvest's entries into the United States.

On July 15, 1999, Nutreco B.V. ("Nutreco"), the Dutch parent company of Mares Australes, purchased all of the outstanding shares of Marine Harvest. *See Pl.'s Mem. in Supp. of its Rule 56.2 Mot. For J. Upon the Agency R.* ("Pl.'s Br.") at 3. On July 1, 2000, Mares Australes was merged into Marine Harvest and no longer existed as a legal entity.[7] *Id.* at 4. In a June 22, 2000 letter, Mares Australes and Marine Harvest informed Commerce of the upcoming merger, urging it to treat the post-merger Marine Harvest as a continuation of the pre-merger Marine Harvest and thus to continue Marine Harvest's exclusion from the antidumping duty order. *See Letter from Shor to Daley* of June 22, 2000, at 8, in App. to *Pl's Br.*

After the initial LTFV investigation, Commerce continued to review entries of Mares Australes and later, Marine Harvest using its authority under two distinct statutory provisions. First, as to Mares Australes, Commerce started the normal administrative review process of the antidumping duty order on fresh Atlantic salmon from Chile. On August 30, 1999, Commerce initiated the first administrative review for the period covering United States sales between July 28, 1998 and June 30, 1999. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part*, 64 Fed. Reg. 47,167 (Aug. 30, 1999). On August 8, 2000, Commerce published the preliminary results of the first administrative review, where it determined, *inter alia*, a zero dumping margin for Mares Australes. *See Notice of Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review: Fresh Atlantic Salmon From*

---

[7] The court notes that July 1, 2000 was the first day of the second administrative review period for Mares Australes. This opinion will refer to Marine Harvest after the merger as "post-merger Marine Harvest," and Marine Harvest before the merger as "pre-merger Marine Harvest."

5

*Chile*, 65 Fed. Reg. 48,457, 48,463 (Aug. 8, 2000) ("*First Administrative Preliminary*"). On

December 15, 2000, Commerce published the final results of the first administrative review,

again determining Mares Australes' dumping margin to be zero. *See Notice of Final Results of*

*Antidumping Duty Administrative Review: Fresh Atlantic Salmon from Chile*, 65 Fed. Reg.

78,472, 78,473 (Dec. 15, 2000) ("*First Administrative Final*"). On September 6, 2000,

Commerce initiated the second review for the period covering sales between July 1, 1999 and

June 30, 2000. *See Initiation of Antidumping and Countervailing Duty Administrative Review*

*and Requests for Revocation in Part*, 65 Fed. Reg. 53,980 (Sept. 6, 2000). On April 9, 2001,

Commerce published the preliminary results of the second administrative review. *See Notice of*

*Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of*

*Antidumping Duty Administrative Review: Fresh Atlantic Salmon from Chile*, 66 Fed. Reg.

18,431 (Apr. 9, 2001) ("*Second Administrative Preliminary*"). These announced Commerce's

contention that "the record establishe[d] that Mares Australes and Marine Harvest were under

common ownership by another company [and, therefore,] the two companies [were] affiliated

under" 19 U.S.C. § 1677(33)(F).[8] *Id.* at 18,433. This finding allowed Commerce to "collapse"

the two companies, i.e. treat them as a single entity under Commerce's regulations.[9] *Id.* In the

_____

[8] In making this determination, Commerce considered the questionnaire responses submitted by Mares Australes and "other information on the record." *Notice of Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review: Fresh Atlantic Salmon from Chile*, 66 Fed. Reg. 18,431, 18,432 (Apr. 9, 2001) ("*Second Administrative Preliminary*").

[9] The applicable regulations are found in 19 C.F.R. § 351.401(f) (2002). The regulations provide that two "affiliated producers" will be treated "as a single entity where [they] have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities" and where "significant potential for the manipulation of price or production" exists. § 351.401(f)(1). In determining whether

final results of the second review period, Commerce again determined a dumping margin percentage of zero for Mares Australes.  *See Notice of Final Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review: Fresh Atlantic Salmon From Chile*, 66 Fed. Reg. 42,505 (Aug. 13, 2001) ("*Second Administrative Final*").  On August 20, 2001, Commerce initiated the third administrative review for the period covering sales between July 1, 2000 and June 30, 2001.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part*, 66 Fed. Reg. 43,570 (Aug. 20, 2001).  In the preliminary results for the third administrative review period, Commerce determined a *de minimis*, 0.11 dumping margin for the post-merger Marine Harvest.  *See Notice of Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination to Revoke the Order in Part, and Partial Rescission of Antidumping Duty Administrative Review: Fresh Atlantic Salmon from Chile*, 67 Fed. Reg. 51,182, 51,191 (Aug. 7, 2002) ("*Third Administrative Preliminary*").  The final results for the third administrative review period are due December 5, 2002.

On August 27, 2002, Commerce initiated the fourth administrative review for the period covering sales between July 1, 2001 and June 30, 2002, and intends to issue the final results "not

there is a significant potential for the manipulation of price or production, the factors to be considered include "the level of common ownership," the extent the firms share managers, and the extent their "operations are intertwined."  § 351.401(f)(2).  In addition to its finding of "common ownership," Commerce also found that Mares Australes and Marine Harvest "had production facilities for similar or identical products that would not require substantial retooling of either facility," and that there was "a significant potential for manipulation of price or production."  *Second Administrative Preliminary* at 18,433.  As a footnote to the finding of "production facilities for similar or identical products," Commerce noted that the two companies' operations were not identical because, e.g., Marine Harvest owned its processing plant whereas Mares Australes subcontracted processing and where Mares Australes purchased its feed for salmon from an affiliated supplier, Marine Harvest used unaffiliated suppliers.  *Id.* 18,433 n.1.

later than July 31, 2003." *Initiation of Antidumping and Countervailing Duty Administrative Review and Requests for Revocation in Part*, 67 Fed. Reg. 55,000 (Aug. 27, 2002).

In addition to conducting administrative reviews of the antidumping duty order that included Mares Australes, Commerce also began a "changed circumstances" review of the post-merger Marine Harvest under section 1675(b) of Title 19 to determine whether the antidumping duty order covered salmon exported by the post-merger Marine Harvest. On July 25, 2000, FAST filed a letter with Commerce responding to the merger ("FAST letter"). *See Def.'s Mem. in Opp. to Pl.'s Rule 56.2 Mot. For J. Upon the Agency R.* ("Def.'s Br.") at 5-6. FAST argued that Nutreco was "'poised'" to channel Mares Australes' products subject to duty through Marine Harvest "'to avoid dumping duties.'" *Id.* at 6 (citing to FAST letter).[10] FAST requested that Commerce assign the deposit rate of Mares Australes "'to all entries made by the merged entity' and indicated its desire to request a review of these entries in the context of the second administrative review." *Id.*

On August 28, 2000, Commerce published the preliminary results of the changed circumstances antidumping duty review. *Changed Circumstances Preliminary.* This was also the first time that Commerce notified Marine Harvest that it had been conducting a changed circumstances review. On the same day, Commerce revoked Marine Harvest's Customer ID number and directed Customs to suspend liquidation of entries of subject merchandise "under the name of Marine Harvest," retroactive to the date of the merger. *Message No. 0241210 from*

---

[10] The court notes that, at this time, the margin on Mares Australes' imports had been determined to be 2.23 (.23 above *de minimis*) in the initial LTFV investigation. Shortly thereafter, in the preliminary results of the first administrative review published August 28, 2000, Mares Australes' dumping margin was zero.

8

*Commerce to Customs* of Aug. 28, 2000, in App. to *Pl.'s Br.* In its preliminary results of changed circumstances review, Commerce determined that "the post-merger Marine Harvest [was] not the successor-in-interest to either of the pre-merger companies, and [was] covered by the antidumping duty order on fresh Atlantic salmon from Chile." *Changed Circumstances Preliminary* at 52,065. In determining that the post-merger Marine Harvest was not a successor to either the pre-merger Marine Harvest or Mares Australes, Commerce used the so-called "successor-in-interest test," considering such factors as the companies' management, production facilities, supplier relationships, and customer base. *Id.* at 52,066. According to Commerce, "evidence on the record establishe[d] that [the post-merger] Marine Harvest . . . [was] substantially different than the pre-merger Marine Harvest" because (1) the management of the post-merger Marine Harvest answered to the parent company of former Mares Australes whose management team included former Mares Australes officials, including the operations manager; (2) the companies' production facilities merged; (3) the post-merger Marine Harvest now purchased all its feed from an affiliate of former Mares Australes, whereas the pre-merger Marine Harvest used unaffiliated suppliers; and (4) the distribution channels of the two companies merged, thus changing the customer base. *Id.* In determining that the post-merger Marine Harvest was also "substantially different from the pre-merger Mares Australes," Commerce noted that (1) the president and the finance and accounting manager of the post-merger Marine Harvest had worked for the pre-merger Marine Harvest; (2) the merged company was a larger company than either former Mares Australes or the pre-merger Marine Harvest; (3) where Mares Australes did not have a processing plant, the merged company had a large processing plant; and (4) the merged company sold retail, whereas the former Mares Australes sold solely to

9

distributors.  *Id.*  Based on these observations, Commerce inexplicably determined that it was "more appropriate to assign the rate currently applicable to the pre-merger Mares Australes rather than the currently applicable all others rate."  *Id.*

In the preliminary results of the changed circumstances review, Commerce also noted that its regulations allow the issuance of the preliminary results of the changed circumstances review "concurrently with the initiation of the review if [Commerce] determines that expedited action is warranted."  *Id.* (citing 19 C.F.R. § 351.221(c)(3)(ii) (2002)).   Commerce justified its issuance of both notice and preliminary results simultaneously by noting without further explanation that there was "substantial evidence regarding the purchase and merger of Marine Harvest with Mares Australes."  *Changed Circumstances Preliminary* at 52,066.  Of course, because of the concurrent initiation and announcement of preliminary results, no parties other than Commerce and the domestic industry had any opportunity to comment on or offer input into Commerce's conclusions.

In the final results of the changed circumstances review, Commerce again determined that the post-merger Marine Harvest is "not the successor-in-interest to either the pre-merger Marine Harvest or the pre-merger Mares Australes, but rather [was] a new entity subject to the antidumping duty order" on fresh Atlantic salmon from Chile.  *Changed Circumstances Final* at 42,507.  Contrary to the preliminary results of the changed circumstances review, Commerce reassigned the post-merger Marine Harvest's "cash deposit rate [as] 0.00 percent, the rate calculated for the combined sales of Marine Harvest and Mares Australes during the second administrative review."  *Id.*

On October 12, 2001, Marine Harvest filed a complaint with this court claiming that

10

Commerce "lack[ed] legal authority under the antidumping statute or its regulations to revoke the . . . exclusion of Marine Harvest from the antidumping duty order and *LTFV Final Determination* granted to Marine Harvest, and suspend the liquidation of entries of subject merchandise produced and exported by Marine Harvest." *Compl.* ¶ 21. Marine Harvest further claimed that Commerce violated "the procedural requirements of the antidumping statute and due process requirements under the United States Constitution" by imposing antidumping duty cash deposits at a rate of 2.23 percent in a preliminary determination without giving Marine Harvest notice and an opportunity to comment. *Compl.* ¶ 24. Marine Harvest further claimed that Commerce's "application of a successorship analysis, and its determination that Marine Harvest is the successor to neither Marine Harvest nor Mares Australes, but is a 'new entity' for antidumping purposes" are not supported by substantial evidence and/or are contrary to law. *Compl.* ¶ 26.

On March 19, 2002, Marine Harvest moved for Judgment upon the Agency Record. *See* USCIT R. 56.2. Marine Harvest asked this court to hold that Commerce's preliminary and final results of the changed circumstances review, published respectively on August 28, 2000 and August 13, 2001, are unlawful. Marine Harvest specifically alleged that (1) Commerce violated the statute by changing Marine Harvest's antidumping duty cash deposit rate from zero to 2.23 percent in a preliminary determination, without giving Marine Harvest notice and an opportunity to comment; (2) Commerce lacked authority to change Marine Harvest's antidumping duty cash deposit rate without computing a new dumping margin; (3) Commerce lacked authority to revoke Marine Harvest's exclusion from the antidumping duty order; and (4) Commerce's conclusion that Marine Harvest is a "new entity" is not supported by substantial evidence and not in accordance with law. *Pl.'s Br.* at x-xiv. Commerce responded by claiming that (1) under

11

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984), deference is due to its interpretations of the statute and (2) its finding that the post-merger Marine Harvest is a "new entity" is supported by substantial evidence and otherwise in accordance with law. *Def.'s Br.* at 18-20.

### III. STANDARD OF REVIEW

Plaintiff asks this court to hold that Commerce's determinations in the preliminary and final results of the changed circumstances review are unlawful. This court must evaluate whether the findings in question are supported by substantial evidence on the record or are otherwise in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B) (1999). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938); *Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). To determine if the agency's interpretation of the statute is in accordance with law the court "must first carefully investigate the matter to determine whether Congress's purpose and intent on the question at issue is judicially ascertainable." *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881 (Fed. Cir. 1998). The expressed will or intent of Congress on a specific issue is dispositive. *See Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 233-37 (1986). If the court determines that the statute is silent or ambiguous, the question to be asked is whether the agency's construction of the statute is permissible. *See Chevron*, 467 U.S. at 843. This deference is due when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the

12

exercise of that authority. *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). This deference is not limited to notice and comment rulemaking but is also given to those "statutory determinations that are articulated in any 'relatively formal administrative procedure.'" *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1380 (Fed. Cir. 2001) (citing *Mead*, 533 U.S. at 252).

## IV. DISCUSSION

There are essentially two issues in this case that this court must resolve. The first issue is whether Commerce's imposing a cash deposit, without notice, in a preliminary changed circumstances review, on the post-merger Marine Harvest at the rate of Mares Australes from the LTFV investigation is in accordance with law. The second issue is whether Commerce's conclusion (in both the preliminary and final results of the changed circumstances review) that the post-merger Marine Harvest is a "new entity" and a successor to neither the pre-merger Marine Harvest nor Mares Australes is supported by substantial evidence or otherwise in accordance with law.[11]

---

[11] At first glance, this court is compelled to observe that Commerce's actions and its accompanying reasonings are internally inconsistent. If the post-merger Marine Harvest is a "new entity," it falls outside the antidumping duty order issued prior to the merger. As an entity not investigated in the initial LTFV investigation, it must be assessed an all-others rate for cash deposits or must go through a new shipper review and be assessed a new cash deposit rate. As Commerce noted, to impose on the merged entity the all-others rate from the LTFV investigation would have been inappropriate since that rate was higher than the rate of either company. *See Changed Circumstances Preliminary* at 52,066. By assigning the post-merger Marine Harvest the rate of Mares Australes, Commerce compels the conclusion that the post-merger Marine Harvest was a successor to an existing entity, perhaps to Mares Australes. If the post-merger Marine Harvest was a successor to one of the companies or both, it could not be a successor to neither and thus it could not be a new entity. Commerce's second anomaly is how an entity that came into existence solely by two separate entities merging is not a continuation of either, but

For the reasons outlined below, the imposition on Marine Harvest of the cash deposit rate of former Mares Australes without notice in a preliminary changed circumstances review is not in accordance with law, and Commerce's conclusion, as a result of the application of its successor-in-interest test to Marine Harvest, that it is a "new entity" is neither supported by substantial evidence nor in accordance with law.[12]

1.  COMMERCE DID NOT HAVE THE AUTHORITY TO IMPOSE A CASH DEPOSIT WITHOUT NOTICE IN THE PRELIMINARY CHANGED CIRCUMSTANCES DETERMINATION.

The statute provides for changed circumstances reviews in § 1675(b) of Title 19 of the United States Code.  Subsection 1675(b)(1) allows Commerce or the ITC to conduct a review after receiving information of "changed circumstances sufficient to warrant a review" of "a final

_____

something entirely different.

[12] This court is mindful of the fact that a potential for circumventing the antidumping statute exists when one company that is covered under an antidumping duty order merges with another that is excluded and then attempts to adopt the mantle of the excluded company so as to evade duties.  However, the antidumping statute is remedial, not punitive.  *See, e.g., NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995).  Therefore, it should not be used to teach a lesson.  Or at the very least, that lesson is not needed in the case of Marine Harvest where all save one dumping margin assessed for both companies were either zero or *de minimis*.  For example, in the case of Jia Farn that led to a congressional investigation and litigation before this Court, a small Taiwanese company that was excluded from an antidumping duty order grew exponentially (from one percent market share in the United States to fifty percent) as a result of transshipping the merchandise of other covered Taiwanese manufacturers who thereby avoided antidumping duties.  There, however, Jia Farn was subsequently found to have virtually no manufacturing capability itself, despite Commerce's repeated determinations that it was a manufacturer, and the antidumping margins that were circumvented were well above 20 percent.  *See Report on the Activity of the Committee on Energy and Commerce for the 103d Congress*, H.R. Rep. 103-882 at 216-19 (Jan. 2, 1995); *Jia Farn Mfg. Co. v. United States*, 17 CIT 187, 817 F. Supp. 969 (1993).

14

affirmative determination that resulted in an antidumping duty order."[13] Subsection 1675(b)(1) further requires that the review will be conducted "after publishing notice of the review in the Federal Register." Subsection 1675(b)(2) provides that in a changed circumstances review the ITC will "determine whether revocation of the [antidumping duty] order . . . is likely to lead to continuation or recurrence of material injury."[14]

Interpreting the statutory provision, Commerce's regulations provide that, if Commerce finds that changed circumstances exist, it "will conduct a changed circumstances review under § 351.216." 19 C.F.R. § 351.222(g)(2) (2002). "An interested party may request a changed circumstances review . . . of an order," at any time. § 351.216(b). The time limit to initiate a review is 45 days after it is requested. *Id.* In addition, to be able to initiate a review within 24 months of the final LTFV determination, Commerce needs to find "good cause." § 351.216(c). In conducting the review, Commerce must adhere to the procedures outlined in § 351.221 that govern all reviews including changed circumstances ("review procedures"). § 351.216(d).

_____

[13] Under the statute, either Commerce or the ITC can conduct a changed circumstances review, depending on the nature of the change. A change in the ownership or name of an entity subject to an antidumping order typically triggers an investigation by Commerce, whereas the ITC may conduct an investigation to ascertain whether material injury or threat of material injury has ceased to exist. *See, e.g., Titanium Metals Co. v. United States*, 155 F. Supp.2d 750 (CIT 2001).

[14] Even though on the face of the statute, a changed circumstances review seems to be authorized to determine only whether an antidumping duty order should be *revoked*, this Court has held that the statutory provision "does not prohibit Commerce from using a changed circumstances review in a proceeding where a revocation is not contemplated." *Jia Farn*, 17 CIT at 193, 817 F. Supp. at 974. Moreover, changed circumstances reviews may be conducted under similar circumstances as those of this case. The *Jia Farn* court also held that Commerce acted reasonably in conducting a changed circumstances review instead of initiating new antidumping proceedings, based upon an allegation that a previously excluded company was "transshipping the merchandise produced by other manufacturers." *Id.* at 193. Thus, the court does not question Commerce's ability to initiate a changed circumstances review in this context.

For all reviews, section 351.221 requires Commerce to "[p]romptly publish . . . notice of initiation of the review," § 351.221(b)(1); to request submission of factual information in the form of answers by interested parties to questionnaires, § 351.221(b)(2); to publish notice of the preliminary results of review, containing any rates assigned and "an invitation for argument," § 351.221(b)(4); and to publish final results, including any rates determined, § 351.221(b)(5), – in that order.[15] "If the type of review . . . involves a determination [of] the amount of duties to be assessed, promptly after publication of the notice of *final results* [Commerce will] instruct the Customs Service to assess antidumping duties . . . on the subject merchandise covered by the review." § 351.221(b)(6) (emphasis added). "If the review involves a revision to the cash deposit rates for estimated antidumping duties, [Commerce will] instruct the Customs Service to collect cash deposits at the revised rates on future entries." § 351.221(b)(7).

For changed circumstances reviews in particular, subsection 351.221(c)(3) supplies a set of special rules. In a changed circumstances review, Commerce "[w]ill include in the preliminary results of review and the final results of review a description of any action [Commerce] proposed based on the preliminary or final results." § 351.221(c)(3)(i). Commerce may also "combine the notice of initiation of the review and the preliminary results of review in a single notice if [it] concludes that expedited action is warranted." § 351.221(c)(3)(ii). The regulations do not provide when an "expedited action" may be "warranted." The recited instructions are the only ones provided in the statute and the regulations concerning changed

---

[15] In conjunction with subsection 351.221(b)(5), subsection 351.216(e) further requires that the issuance of the final results of the changed circumstances review will be "within 270 days after the date on which the changed circumstances review is initiated, or within 45 days if all parties to the proceeding agree to the outcome of the review."

16

circumstances reviews. Certainly neither the statute nor the regulations specifically permit the government to revise or assess a cash deposit rate in a preliminary determination (and start collecting duties from an exporter) without notice to the exporter under review.

As the government points out,"[b]y its own terms, [the statutory changed circumstances review] provision does not mandate (or even discuss) the parameters of a changed circumstances review nor limits [sic] the types of actions that Commerce may take in a changed circumstances review." *Def.'s Br.* at 27. The statute also does not address the issue as to what should happen when two types of reviews have been initiated, one as a changed circumstances review, the other as an administrative review. *See SKW Stickstoffwerke Piesteritz GmbH v. United States*, 21 CIT 1336, 1339, 989 F. Supp. 253, 256-57 (1997).[16] The government argues that "[w]hen the statute is read in context, . . . it is apparent that a change in the cash deposit rate is one of the permissible actions that Commerce may take in a changed circumstances review." *Def.'s Br.* at 27. The government reasons that changed circumstances reviews are conducted to review the final determinations of an LTFV investigation and a cash deposit rate (or the lack thereof) is one of the determinations made in an LTFV investigation. *Id.* Therefore, "a decision made by the agency with respect to cash deposits is one that may be reviewed in the context of a changed circumstances review." *Id.* at 28.

The government alternatively argues that "[e]ven if this contextual analysis is insufficient

---

[16] The *SKW* court also stressed the disutility of conducting administrative and changed circumstances reviews simultaneously, however. *See SKW,* 21 CIT at 1340, 989 F. Supp. at 257. In condoning Commerce's termination of a changed circumstances review when an annual administrative review was in progress, the *SKW* court noted that Commerce's interpretation "that Congress did not intend it to conduct two reviews of the same merchandise for the same purpose [was] reasonable" because otherwise "duplicate proceedings which expend Commerce's limited resources" and "inconsistent findings" may result. *Id.*

to affirmatively support Commerce's authority in a changed circumstances proceeding to review and change the applicable cash deposit rate . . . , nothing in the statute precludes Commerce from doing so." *Id.* at 28. The government thus concludes that its interpretation of the statutory silence is reasonable and should be accorded judicial deference under *Chevron*. *Id.* at 29.

Under *Chevron*, when the intent of Congress is clear on the face of the statute, the inquiry as to the reasonableness of an agency's actions ends because "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43; *see also Ipsco, Inc. v. United States*, 899 F.2d 1192, 1195 (Fed. Cir. 1990) ("we cannot sustain [Commerce's] exercise of administrative discretion if it contravenes statutory objectives."). Thus, *Chevron* deference applies only when there is an ambiguity in the statute. The government does not point to any ambiguity in the statute. Neither does this court find any. The government's position is merely (a) that the entire statutory scheme supports its actions and (b) that, even if it does not, it does not preclude them. The court cannot agree.

First, Commerce does not have absolute discretion to take action on and revise existing antidumping orders. *Ericsson GE Mobile Communications, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995) (even though "Commerce . . . enjoys substantial freedom to interpret and clarify its antidumping duty orders . . . , it may not change them" (citation omitted)). For example, in a scope determination, Commerce "cannot 'interpret' an antidumping order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms." *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001) (citation omitted).

18

More importantly, the statute does not support Commerce's authority to change a final cash deposit rate in a preliminary changed circumstances determination without following the procedural safeguards embedded therein. It is true that the statute does not explicitly forbid such action. However, a review of the entire statutory and regulatory scheme compels the conclusion that Commerce acted unreasonably and contrary to the statutory scheme. The changed circumstances review provision in the statute emphasizes that review will be conducted "*after* publishing notice of the review in the Federal Register.*" 19 U.S.C. § 1675(b)(1) (1999) (emphasis added). Thus, the statute on its face does not allow the initiation of the review without prior notice. Moreover, the regulations about review procedures are conditioned on ample notice and opportunity to comment before antidumping duties may be imposed. *See* 19 C.F.R. § 351.221 (2002). In particular, the regulations are explicit that antidumping duties will be imposed *after the publication of final results*. *See* § 351.221(b)(5) & (6) (emphasis added). It is true that the provision concerning the revision of cash deposit rates does not contain a time frame, *see* § 351.221(b)(7), and that Commerce may combine notice of initiation with notice of preliminary results, *see* § 351.221(c)(3)(ii); however, read within the context of the entire § 351.221, these provisions fall short of granting Commerce the authority to combine notice of initiation with preliminary results and to impose a cash deposit requirement at the same time.

Furthermore, there is no prior case where Commerce conjoined the initiation of review, the publication of preliminary results, and the imposition of antidumping duties. The government relies on *Jia Farn Mfg. Co.*, 17 CIT 187, 193, 817 F. Supp. 969, 974 (1993), to argue that this Court has previously approved such authority. However, the government's reliance on *Jia Farn* is misplaced. Even though in *Jia Farn* this Court upheld the imposition of a

19

cash deposit requirement as of the date of a preliminary changed circumstances determination, it did not say that the requirement of a cash deposit is permissible in a preliminary changed circumstances review without first giving parties sufficient notice of the initiation of the review. *See id.* at 193. Apart from the clear factual differences between this case and *Jia Farn*, *see* footnote 12, *supra*, the plaintiff in *Jia Farn* was notified of the review more than two months before its initiation.[17] *See Sweaters Wholly or in Chief Weight of Man-Made Fiber From Taiwan; Initiation of Changed Circumstances Antidumping Duty Administrative Review*, 57 Fed. Reg. 43,705 (Sept. 22, 1992); *Preliminary Results of Changed Circumstances Antidumping Duty Administrative Review*, 57 Fed. Reg. 56,322 (Nov. 27, 1992). This Court has always recognized that "[p]reliminary results are presumably less reliable than final results of investigations or administrative reviews." *China Nat'l Arts and Crafts Imp. and Exp. Corp. v. United States*, 15 CIT 417, 422, 771 F. Supp. 407, 412 (1991). The rationale is that "[p]reliminary results are reviewed and commented upon by interested parties before becoming final." *Id.* (citations omitted). "Hearings are held, if requested." *Id.* Commerce "uses the time between preliminary and final determinations to correct and adjust its preliminary findings and reach more accurate

---

[17] In the case of Jia Farn also, Commerce did not make a blanket determination that all entries by the previously excluded company were now subject to the antidumping duty order and was careful differentiating between the entries subject to the order and the entries which were not. *See Sweaters Wholly or in Chief Weight of Man-Made Fiber from Taiwan; Final Results of Changed Circumstances Antidumping Duty Administrative Review*, 58 Fed. Reg. 32,644, 32,654 (June 11, 1993) ("Entries made subsequent to the period of this changed circumstances review . . . will be considered entries not manufactured by Jia Farn, and thus subject to the antidumping duty order, except to the extent that Jia Farn can satisfy [Commerce], in the course of future reviews, that it was the actual manufacturer of any [excluded] sweaters it exports to the United States.").

conclusions in the final determination." *Id.* (citation omitted). Here, Commerce did in fact revise Marine Harvest's cash deposit rate to zero from the preliminary to the final changed circumstances results – which action removes any credibility from its imposition of a 2.23 percent cash deposit rate on Marine Harvest in the preliminary.

A survey of Commerce's past practice in changed circumstances reviews yields no further examples where even a revision of the cash deposit requirement accompanied the simultaneous issuance of notice and of preliminary results.[18] Imposing on Marine Harvest a cash deposit requirement of 2.23 percent in the preliminary determination allowed the government to collect money (totaling millions of dollars) on the entries of the company in the course of a whole year (from August 2000 to August 2001) until the changed circumstances review became final. This

---

[18] Typically, Commerce maintains a company's current cash deposit rate until the publication of the final results of a changed circumstances review. *See, e.g., Certain Corrosion-Resistant Carbon Steel Flat Products from Japan: Notice of Initiation and Preliminary Results of Changed Circumstances Review of the Antidumping Order, and Intent to Revoke Order in Part*, 67 Fed. Reg. 47,766, 47,768 (July 22, 2002) (containing boilerplate language that is repeated in most preliminary results: "The current requirement for a cash deposit of estimated antidumping duties on [merchandise] will continue unless and until we publish a final determination to revoke in part."). In instances where Commerce determined preliminarily that a new company is the successor of a former one, it allowed the new company to retain the cash deposit rate of its predecessor until the publication of final results. *See, e.g., Brake Rotors From the People's Republic of China: Initiation and Preliminary Results of Changed-Circumstances Antidumping Duty Administrative Review*, 65 Fed. Reg. 69,732, 69,733 (Nov. 20, 2000); *Certain Hot-Rolled Lead and Bismuth Carbon Steel Products From the United Kingdom: Initiation and Preliminary Results of Changed-Circumstances Antidumping and Countervailing Duty Administrative Reviews*, 64 Fed. Reg. 53,994, 53,995 (Oct. 5, 1999); *Polyethylene Terephthalate Film, Sheet and Strip From the Republic of Korea: Initiation and Preliminary Results of Changed Circumstances Antidumping Duty Administrative Review*, 62 Fed. Reg. 61,801, 61,802 (Nov. 19, 1997). In the one and only occasion cited in Defendant's brief where Commerce found that a joint venture was a successor to neither of the companies that created it, the new company was assigned an all-others rate in the preliminary determination. *See Notice of Initiation and Preliminary Results of Changed Circumstances Antidumping Duty Review: Certain Polyester Staple Fiber from the Republic of Korea*, 66 Fed. Reg. 1642, 1643-44 (Jan. 9, 2001).

case is before the court because Commerce has yet to refund the money, although in the final results of the changed circumstances review the merged entity was reassigned a cash deposit rate of zero.[19] *See Changed Circumstances Final* at 42,507. Moreover, prior to the preliminary changed circumstances results (on August 28, 2000), Mares Australes was assigned a dumping margin of zero in the preliminary first administrative review results. *See First Administrative Preliminary* (Aug. 8, 2000). Subsequent to the preliminary changed circumstances results, Mares Australes and later the post-merger Marine Harvest were found not to be dumping on at least four separate occasions. *See First Administrative Final* (Dec. 15, 2000); *Second Administrative Preliminary* (Apr. 9, 2001); *Second Administrative Final* (Aug. 13, 2001); *Third Administrative Preliminary* (Aug. 7, 2002). In addition, the pre-merger Marine Harvest was never found to be dumping. Commerce acts contrary to the statutory scheme when it posits a theory that allows it to take and keep the money of an exporter which, if given the chance during any kind of investigation, would have been able to show that no dumping had occurred.

Nor is it reasonable to conclude that such an exporter knew or should have known that it would be shortly subjected to antidumping duties. The government contends that the antidumping duty order "provided Marine Harvest with prior notice of the merchandise subject to antidumping duties." *Def.'s Br.* at 30. But Marine Harvest was excluded from that order. The

---

[19] The government claims that the antidumping duties collected from Marine Harvest entries during that year will be refunded when the final determination of the third administrative review issues in December, 2002, assuming that the preliminary margins of zero for the post-merger Marine Harvest are confirmed for the final. Commerce is treating the third administrative review period for Mares Australes as the first administrative review period of the merged entity. Since Marine Harvest was determined to be a "new entity" by Commerce it will be required to participate in three full reviews showing no dumping before it can be excluded from the order. *See* 19 C.F.R. § 351.222(b)(1)(i)(A) (2002).

most that can be inferred may be that the antidumping duty order could have provided Marine

Harvest with notice that a changed circumstances review might have been conducted in the event

of the merger and that perhaps antidumping duties could have been assessed in the final

determination, but not that such duties would be assessed in a preliminary determination.

The government further argues that "the company should have requested a new shipper

review" if it "desired a [sic] opportunity to comment before Commerce imposed a cash deposit

requirement with respect to its merchandise." *Def.'s Br.* at 32 (emphasis in the original) (citing

19 U.S.C. § 1675(a)(2)(B) (1999) ("Determination of antidumping or countervailing duties for

new exporters and producers")). The court fails to see how Marine Harvest could have known

that it was a new shipper when it did not fit the statutory definition. To be considered a new

shipper, the new entity must be neither a former exporter nor affiliated with a former exporter. §

1675(a)(2)(B)(i).[20] "Two or more persons directly or indirectly controlling, or controlled by, or

---

[20] Subsection 1675(a)(2)(B)(i) reads as follows:

> If the administering authority receives a request from an exporter or producer of the subject merchandise establishing that–
>
> > (I) such exporter or producer did not export the merchandise that was the subject of an antidumping duty . . . order to the United States . . . during the period of investigation, and
> > (II) such exporter or producer is *not affiliated* (within the meaning of section 1677(33) of this title) with any exporter or producer who exported the subject merchandise to the United States . . . during that period,
>
> the administering authority shall conduct a review under this subsection to establish an individual weighted average dumping margin . . . for such exporter or producer (emphasis added).

under common control with, any person" are "affiliated." § 1677(33)(F).[21] Commerce itself found that "Mares Australes and Marine Harvest were under common ownership by another company [and] the two companies [were] affiliated under section" 1677(33)(F). *See Second Administrative Preliminary & Final.* Therefore, Marine Harvest would have been misreading the statute to assume it qualified for a new shipper review. However, had Marine Harvest been able to request a new shipper review, that indeed would have been to its advantage, as subsection 1675(a)(2)(B)(iii) allows "the posting, until the completion of the review, of a bond or security in lieu of a cash deposit for each entry of the subject merchandise," and bonds are less costly than cash deposits.[22]

In sum, this court finds no support in the statutory and regulatory language for Commerce's imposition of a cash deposit on Marine Harvest's entries without notice in a preliminary determination. This court also questions the imposing on Marine Harvest's entries a cash deposit at the dumping margin of Mares Australes found in the LTFV investigation. Under

---

[21] Mares Australes, the pre-merger and the post-merger Marine Harvest have all been at some point under the control of the same company. Nutreco, originally the parent company of Mares Australes, purchased Marine Harvest and merged Mares Australes into Marine Harvest. Marine Harvest then became a subsidiary of Nutreco. Having a parent company in common, Marine Harvest is thus "affiliated" with both Mares Australes and the pre-merger Marine Harvest for the purposes of § 1675(a)(2)(B).

[22] Two other statutory provisions, on which Commerce implicitly relies to impose a cash deposit requirement on Marine Harvest (namely, the provisions that allow the imposition of cash deposits at the preliminary and final stages of an LTFV investigation), merely give Commerce the option of imposing cash deposits and do not compel it. For example, § 1673d(c)(1)(B)(ii) provides that "the administering authority shall order the posting of a cash deposit, bond, or other security, as the administering authority deems appropriate" if the final determination of the LTFV investigation is affirmative. In other words, Commerce could have asked Marine Harvest to post a bond or another security instead of collecting its money prematurely. Here, Marine Harvest was not given the option of posting a bond.

one better approach, Commerce could have used a 50-50 weighted average of the dumping

margins of the pre-merger Marine Harvest and Mares Australes that would have yielded a cash

deposit rate of 1.795 for the post-merger Marine Harvest, which is *de minimis*, dictating the

conclusion that the merged entity would have been excluded from the antidumping order. *See*

Oral Arg. Tr. 11:2-12.[23]  Indeed, almost any other choice Commerce could have made would

have been more reasonable than its actions at issue before the court in this case.  By assigning the

merged entity the rate of Mares Australes, Commerce seems to have presumed that the merged

entity is all Mares Australes and nothing else.  Moreover, given that the first administrative

review's preliminary results indicated a zero percent dumping margin for Mares Australes and

the pre-merger Marine Harvest had a *de minimis* margin, there was no justification to assign the

post-merger Marine Harvest an above *de minimis* margin.  Commerce could also have waited

four months until Mares Australes' cash deposit rate was finalized in the first administrative

review to assign a cash deposit rate to the post-merger Marine Harvest, which by all reasoning

could only be zero or *de minimis*.  "[I]t is Commerce's duty to determine margins as accurately as

possible, and to use the best information available to it in doing so."  *Lasko Metal Prods., Inc. v.

United States*, 43 F.3d 1442, 1443 (Fed. Cir. 1994).  Even though "best information" does not

necessarily mean the most current margin, the imposition of a high possible margin on a

company should be reserved for those cases where Commerce needs to assign the higher rate to

---

[23] On July 22, 2002, an oral argument was held before this court.  "Tr." refers to the transcript of the oral argument.  This approach would have been permissible given that at the time of the merger, "Marine Harvest was by far the bigger producer of the two companies, having produced and sold almost 50 percent more salmon in the first five months of 2000 than Mares Australes," *Pl.'s Br.* at 4, the pre-merger Marine Harvest would plausibly be assigned at least a 50 percent weight in the merged entity, and the merged entity would thus be excluded from the order by this approach.

25

compel cooperation in providing accurate data. *See Rhone Poulenc Inc. v. United States*, 899 F.2d 1185, 1190-91 (Fed. Cir. 1990). In the case of Marine Harvest, there was no reason to use the higher margin as an "informal club," *id.* at 1191, to ensure cooperation in the future since there was no indication (or allegation) that Marine Harvest or Mares Australes was providing Commerce with inaccurate data.

In addition to arguing that the entire statutory scheme supports its actions, the government argues in the alternative that the statute does not preclude its actions and, therefore, its interpretation of statutory silence should be accorded *Chevron* deference. However, *Chevron* does not allow an agency to fill gaps in a statute where there is no ambiguity, or take authority upon itself where no such authority has been explicitly or implicitly granted. Recently, in *FAG Italia S.p.A v. United States*, the Federal Circuit drew a distinction between ambiguous statutory language that creates a "gap" in the statute that an agency could reasonably fill and a silence in the statute from which an agency cannot create authority. 291 F.3d 806 (Fed. Cir. 2002). In *FAG Italia*, the issue was whether Commerce had statutory authority to conduct an absorption inquiry in years other than the second or fourth after a transition order was issued, as was provided in the statute. *See id.* at 808. Commerce argued that it had authority "because both the statute and its legislative history [were] silent as to whether Commerce [could] conduct duty absorption inquiries in years other than years 2 and 4, and the statute [did] not explicitly prohibit or deny it such authority." *Id.* at 815. In finding that Commerce lacked such authority, the Federal Circuit noted that no case has held that "an administrative agency has authority to fill gaps in a statute that exist because of the absence of statutory authority." *Id.* at 816. "To the contrary, . . . 'an agency literally has no power to act . . . unless and until Congress confers power

26

upon it.'" *Id.* (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).

Accordingly, "the absence of a statutory authority cannot be the source of agency authority." *Id.*

Moreover, "*Chevron* specifically forbids agencies from creating ambiguities in statutes to expand

their power." *Cases and Recent Developments*, 12 Fed. Cir. B.J. 135, 180 (2002). Similarly

here, nowhere in the statute is the collection of antidumping duties authorized prior to a

meaningful review. Commerce's actions here are clearly unreasonable viewed in the context of

the statute's requirements for meaningful participation and review.

2. COMMERCE'S CONCLUSION IN THE SUCCESSOR-IN-INTEREST TEST IS NOT IN ACCORDANCE WITH LAW AND IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

Commerce's determination that Marine Harvest is a new entity is not in accordance with

law. While the court must defer to an agency's reasonable interpretations of ambiguous statutory

language, no deference is due under *Chevron* to agency interpretations that contravene the

statute. Commerce's successor-in-interest test appears neither in the antidumping statute nor in

the regulations. Commerce appropriately developed the test to determine, e.g. whether a

company remains subject to an antidumping duty order, under changed circumstances, such as

corporate reorganization, and has used the test, for at least a decade, "to ensure the proper

administration of the antidumping laws." *Brass Sheet and Strip from Canada; Final Results of*

*Antidumping Duty Administrative Review*, 57 Fed. Reg. 20,460, 20,461 (May 13, 1992). While

the court need not determine whether Commerce's use of the successor-in-interest test in general

is reasonable, the court observes that in this case, Commerce's conclusion, as the result of the

application of the successor-in-interest test, that Marine Harvest is a new entity cannot be

reconciled with provisions of the antidumping statute and is not supported by substantial

evidence.

Specifically, Commerce ignored statutory mandates for defining new entities under an order. Under the antidumping statute, a new exporter is an exporter that enters the market after the issuance of an antidumping order and which is neither a former exporter, nor affiliated with a former exporter. *See* § 1675(a)(2)(B) (providing a review for new exporters). "Two or more persons directly or indirectly controlling, or controlled by, or under common control with, any person" are "affiliated." § 1677(33)(F). Mares Australes, the pre-merger and the post-merger Marine Harvest, the producers of the merchandise in question, have all been at some point under the control of the same company, Nutreco. Marine Harvest is thus "affiliated" with both Mares Australes and the pre-merger Marine Harvest under this definition. Moreover, Commerce itself determined that Mares Australes and Marine Harvest are "affiliated" under § 1677(33)(F), which finding allowed Commerce to collapse the two companies for purposes of review. *See Second Administrative Preliminary & Final.* Since Marine Harvest is affiliated with one or two former exporters which were in business at the time of the issuance of the antidumping duty order, it cannot be a new exporter under the antidumping statute. If it is not a "new exporter" under the statute, then Commerce cannot determine that it is a "new entity," for such determination would clearly be contrary to the statute. Furthermore, by arguing that Marine Harvest "should have requested a new shipper review," *Def.'s Br.* at 32, the government effectively conceded that when it says "new entity" or "new shipper," it really means "new exporter." Thus, the government's argument also contradicts the statute by implying that Marine Harvest comes under the purview of the new exporter review provision of the antidumping statute.

Moreover, even though Commerce may depart from its earlier determinations and its own

28

prior precedent, "[w]hatever the ground for departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's actions and so may judge the consistency of that action with the agency's mandate." *Atchison, T. & S.F. Ry. v. Wichita Bd. Of Trade*, 412 U.S. 800, 808 (1973). Such unexplained departures are not permissible. *See NLRB v. Int'l Union of Operating Engineers, Local 925*, 460 F.2d 589, 604 (5th Cir. 1972). Here, Commerce never explained the inconsistency of its determinations that, on the one hand, Mares Australes and Marine Harvest are affiliated and, on the other hand, the post-merger Marine Harvest is a new entity. Thus, this court finds that Commerce's interpretation of the statute is unreasonable.

Commerce's determination that Marine Harvest is a new entity is also not supported by substantial evidence. Actually, there is no evidence in the record that Marine Harvest is a new entity and not a successor to either Mares Australes or the pre-merger Marine Harvest. Marine Harvest came into being by the merging of the operations of two companies with nothing extraneous added to the mix. In fact, in finding that the post-merger Marine Harvest is not a successor to the pre-merger Marine Harvest, Commerce listed as evidence all the factors that the post-merger Marine Harvest has in common with Mares Australes. *See Changed Circumstances Preliminary* at 52,066. In finding that the post-merger Marine Harvest is not a successor to Mares Australes, Commerce listed as evidence all the factors that the post-merger Marine Harvest has in common with the pre-merger Marine Harvest. *See id.* At the end, Commerce concluded that the post-merger Marine Harvest is a successor to neither.[24] If Marine Harvest

_____

[24] To illustrate how Commerce cannot reasonably assert such a conclusion, the court offers the following analogy. Individual A and Individual B claim ownership to the same automobile. A and B come before a judge to sort out the matter. The judge decides that A is not

could not be Marine Harvest because it is too close to Mares Australes and if Marine Harvest could not be Mares Australes because it is too close to Marine Harvest, how could it be that Marine Harvest is different than either, thus a new entity? By the evidence that Commerce itself cites, Marine Harvest has to be a successor to both companies or at least to one of them.

Commerce cites only one prior case where under similar circumstances in a changed circumstances review, using the successor-in-interest test, it determined that a joint venture was not a successor to either of the companies that created it. *See Notice of Final Results of Changed Circumstances Antidumping Duty Review: Certain Polyester Staple Fiber From the Republic of Korea*, 66 Fed. Reg. 30,411 (June 6, 2001); *Notice of Initiation and Preliminary Results of Changed Circumstances Antidumping Duty Review: Certain Polyester Staple Fiber From the Republic of Korea*, 66 Fed. Reg. 1642 (Jan. 9, 2001). As a result, the joint venture was assigned an all-others rate. One of the former companies was investigated in the initial LTFV investigation, found not dumping, was thus excluded from the order, whereas the other was never investigated. Although the joint venture initially argued that it was the successor to the excluded company, it never challenged the preliminary results of the changed circumstances review that determined that it was a successor to neither company.[25]

the owner of the automobile because B's name appears on its title. The judge further decides that B is not the owner of the automobile because A's name appears on its title. The judge thus concludes that evidence shows that the automobile belongs to neither A nor B because both of their names are on its title, instead of deciding that all evidence points to joint ownership by A and B of the automobile.

[25] Nor did it seek this Court's jurisdiction to overturn the final determination. Commerce never denoted the joint venture as "new entity," it merely decided that it was not a successor to either company. Commerce's reasoning in the successorship determination contains the same logical fallacy as here, but there is at least some justification in assigning the all-others rate to the joint venture as one of its predecessors was never investigated.

To the extent this court determines that the post-merger Marine Harvest is not a new entity, Commerce has to determine whether it is a successor to either one of the companies or both. The court therefore remands to Commerce to be guided by this opinion to decide whether the post-merger Marine Harvest is a successor to either company or both. The court is cognizant of the fact that if the post-merger Marine Harvest is a successor to the pre-merger Marine Harvest, it was never under the antidumping order and thus all reviews of the company must cease. If the post-merger Marine Harvest is a successor to Mares Australes or to both companies, it is now going through its third annual review, and if it is found not dumping in this review (as in the previous two annual reviews and the preliminary determination of the third), it must be excluded by Commerce from the existing antidumping duty order when the final determination of the third annual review is issued. Commerce has 60 days to issue its remand determination; however, the court is also mindful of the fact should the final determination of the third annual review be issued before that and should the post-merger Marine Harvest be found not to be dumping, the remand may become moot.

31

## V. Conclusion

For the reasons outlined above, the imposition on Marine Harvest of the cash deposit rate of former Mares Australes without notice in a preliminary changed circumstances review is not in accordance with law and those deposits must be timely refunded. Commerce's conclusion, as a result of the application of its successor-in-interest test to Marine Harvest, that it is a "new entity" is neither supported by substantial evidence nor in accordance with law and the court, therefore, will remand to the agency for review and action consistent with this opinion.


Dated: _____                                    _____
        New York, NY                                          Judith M. Barzilay
                                                              Judge

ERRATA

*Marine Harvest (Chile) S.A. v. United States*, Court No. 01-00808, Slip Op. 02-134, Dated October 31, 2002.

Page 3, line 16 (last line):

Delete superscript 4 after "respectively."  There is no footnote text corresponding to superscript 4.  Renumber the subsequent footnotes accordingly, i.e. footnote 5 should be renumbered footnote 4, etc.

November 6, 2002